**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| Al.C., A.P., An.A., An.D., Ari.R., Arn.R., A.V., C.V., E.M., Ed.T., E.D.L., E.L., Er.T., F.S., F.T., F.B., G.D.L., G.O., H.V., J.N.B., J.F., J.A., J.C., J.P., L.G., P.C., Ra.L., Ra.V., R.B., R.B.E., Re.C., Ri.C., R.F., Rog.B., Rom.B., R.E., R.N., R.T., T.L., and V.M., | Case No. 25-cv-274 |
| Plaintiffs, | **FIRST AMENDED COMPLAINT** |
| v. | JURY TRIAL DEMANDED |
| JACOBS SOLUTIONS INC., JACOBS ENGINEERING GROUP INC., CH2M HILL COMPANIES, LTD., CH2M HILL INTERNATIONAL, LTD., and CH2M HILL INTERNATIONAL B.V. | |
| Defendants. | |

## I.    NATURE OF THE ACTION

1.    When the 2022 FIFA World Cup was awarded to Qatar in 2010, it kicked off the most ambitious infrastructure-development project in Qatar's history.  To host dozens of games and millions of spectators, the Qatari regime built a new airport, expanded rail infrastructure, and constructed dozens of new hotels.  And the Qatari regime constructed several state-of-the-art stadiums that were designed to keep players, spectators, and media comfortable during scorching, humid days in a place where the temperatures can reach 118 degrees Fahrenheit.  Hailed (by some) as a resounding success (for some), the 2022 FIFA World Cup generated billions of dollars in revenue for Qatar's brutal authoritarian dictatorship.

1

2.      The Qatari regime's World Cup "triumph" was built on a foundation of human trafficking and forced labor.  Qatar's ruling regime realized its dream of hosting the 2022 FIFA World Cup only through untold thousands of migrant workers being subjected to nightmarish conditions.  Construction workers toiled long hours in the desert heat, often without adequate rest, hydration, and nourishment.  Many were routinely forced to work overtime without pay.  Many were forced to live in inhumane, cramped, dirty, and sometimes pest-infested barracks.  Pay was withheld.  Passports were confiscated by the workers' employers, leaving them unable to visit home or find a humane job. Workers were treated as disposable.  Thousands of migrant workers— including some of the Plaintiffs in this case—suffered severe physical injuries and mental trauma. At least hundreds more died.  That is why many have referred to human trafficking, forced labor, and related labor abuses during the preparations for the Qatar World Cup as "modern slavery."

3.      In terms of the scale of victims and contemporaneous media condemnation, the 2022 FIFA World Cup involved one of the worst labor-trafficking schemes in recent history.  But this is just the latest episode in Qatar's reprehensible history sponsoring and benefitting from trafficked and forced labor.  Long before the Qatari regime broke ground on new stadiums, it was widely condemned by governments, non-governmental organizations ("NGOs"), journalists, and victims as one of the worst trafficking and forced labor locales on Earth.  Observers across the ideological spectrum routinely and emphatically criticized Qatari conditions under which migrant laborers toiled.  The Qatari regime's (and Qatari employers') reliance on trafficked and forced labor was plainly visible to anyone who bothered to look.

4.      Against this backdrop, Defendants Jacobs Solutions Inc., Jacobs Engineering Group Inc. (collectively "Jacobs"), and Defendants CH2M Hill Companies, Ltd., CH2M HILL

2

International, Ltd., and CH2M HILL International B.V. (collectively, "CH2M" and, with Jacobs, "Defendants") chose to knowingly participate in—and profit from—ventures that exploited Plaintiffs' labor for construction projects for the 2022 FIFA World Cup.  When they did, Defendants knew that working conditions were unsafe: in an on-the-record interview, a CH2M manager blithely observed that "***his team has estimated that at least 14 people will die while building Qatar's World Cup stadiums***" before joking—about the labor conditions imposed on workers like Plaintiffs—that "***[t]here are quite a few unsafe construction sites . . . I am half expecting bodies to land next to me every time I go past.***" (Emphasis added.)

5.      Plaintiffs were among the thousands of construction workers who were lied to—about the work they would do, the pay they would receive, the inhumane living conditions they would endure, and the fatally dangerous and unsafe conditions they would work in—to build the stadiums and infrastructure for the 2022 FIFA World Cup.  Defendants, richly compensated to oversee and manage the construction projects, with and through the companies with which they jointly ventured, abused the Plaintiffs, subjected migrant laborers to these inhumane working and living conditions—and took away their passports to prevent their escape.

6.      Because Defendants' joint venturers lied to Plaintiffs about the terms and conditions of their employment and living conditions and confiscated Plaintiffs' passports, Plaintiffs were unable to leave Qatar, address their condition of inhumane and forced labor, or change employers.  They were trapped in Defendants' venture's systematic embrace of, and profits from, the institutionalized trafficked and forced labor omnipresent in Qatar.  Defendants' conduct violated state and federal law, including the Trafficking Victims Protection Reauthorization Act (the "TVPRA").  Defendants trafficked Plaintiffs and forced Plaintiffs to work in violation of 18

3

U.S.C. § 1589 and 18 U.S.C. § 1590.  Defendants, integrally involved in construction preparations for the Qatar World Cup, knowingly benefitted from participation in ventures they knew or should have known relied on trafficked and forced labor.  Defendants are therefore liable pursuant to 18 U.S.C § 1595(a).

## II.    JURISDICTION AND VENUE

7.    Plaintiffs bring their claims in this District because Defendants participated in and knowingly benefitted from the World Cup Construction Venture (as defined below) in Colorado. Further, to the extent Defendants' other acts were outside the United States, the 2013 amendments to the TVPRA explicitly provide for extraterritorial jurisdiction.  *See* 18 U.S.C. § 1596.  18 U.S.C. § 1596(a) makes clear that Defendants are liable to the extent their conduct was outside of the United States because they chose to remain present in the United States or be nationals of the United States.

8.    Plaintiffs' TVPRA claims accrued after December 23, 2008, the effective date of 18 U.S.C. § 1596.

9.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) based on diversity of citizenship.  All Plaintiffs are foreign nationals as well as citizens and residents of the Philippines, and each of their claims for damages exceeds $75,000.  Defendants are United States corporations and their subsidiaries.

10.    Defendants are nationals of the United States or are present in the United States, irrespective of nationality, providing this Court with extraterritorial and federal-question jurisdiction under 18 U.S.C. § 1596(a) and 28 U.S.C. § 1331.

11.      No foreign government has prosecuted or is prosecuting Defendants for the conduct alleged herein.

12.      Defendants CH2M Hill Companies, Ltd. and CH2M HILL International, Ltd. maintain their corporate headquarters in Colorado.  CH2M HILL International B.V. is incorporated in the Netherlands, and has operations, among other places, in Colorado, the Netherlands, and Qatar.  Each of CH2M Hill Companies, Ltd., CH2M HILL International, Ltd., and CH2M HILL International B.V. does substantial and continuous business within the State of Colorado, by virtue of CH2M's integration throughout its firm, knowingly benefitted in Colorado from the joint venture's exploitation of forced labor, and on information and belief made decisions and took actions in this District in furtherance of the venture that caused or contributed to the Plaintiffs' harms, *see infra* ¶¶ 28–31, so they are subject to both general and specific personal jurisdiction before this Court.

13.      Defendants Jacobs Engineering Group Inc. and Jacobs Solutions Inc. are incorporated in Delaware and have their global headquarters in Texas.  Jacobs at all relevant times maintained corporate offices in Colorado and did and continues to do substantial and continuous business within the State of Colorado, by virtue of Jacobs's integration throughout its firm, and Jacobs and its subsidiaries knowingly benefitted in Colorado from the joint venture's exploitation of forced labor, and on information and belief Jacobs made decisions and took actions in this District in furtherance of the venture that caused the Plaintiffs' harms, *see infra* ¶¶ 28–31, so Jacobs is subject to specific personal jurisdiction before this Court. Though Jacobs Solutions Inc. was incorporated after the Plaintiffs completed their work, it knowingly benefitted from the venture's

5

exploitation of forced labor and has successor liability for Jacobs Engineering Groups earlier conduct.

14.     Plaintiffs' state-law claims arise out of the same case or controversy as their federal-law claims and involve a common nucleus of operative facts.  All injuries Plaintiffs suffered were the result of their being trafficked and subjected to harsh conditions performing forced labor.  Thus, this Court also has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367.

15.     Under 28 U.S.C. §§ 1391(b)(3) and (c)(2), venue over the Defendants is proper in this District.  Based on subsection (b)(3), venue is proper because this District is one where Defendants are subject to personal jurisdiction.  Further, based on subsection (c)(2), Defendants are deemed to reside in this District because Defendants are subject to personal jurisdiction here.

### III.    THE PARTIES

16.     In August 2022, just before the World Cup 2022 kicked off, Jacobs Engineering Group Inc. became a wholly owned subsidiary of Jacobs Solutions Inc.  This was simply a rebranding of the main parent Jacobs entity, which continued unchanged, as Jacobs Solutions Inc. continues to have the same assets, employees, and contractual counterparties Jacobs Engineering Group Inc. had before the reorganization.

17.     Jacobs is a Fortune 300 company, with over 58,000 employees and annual revenue of over $14 billion.  Jacobs has offices all over the world, including in the Philippines and Qatar.

18.     According to Jacobs, it "provides a full spectrum of professional services including consulting, technical, scientific and project delivery for the government and private sector."

19.     In 2017, Jacobs acquired and made into its wholly owned subsidiary Defendant CH2M (including CH2M Hill Companies, Ltd.'s subsidiaries, including CH2M HILL International, Ltd. and CH2M HILL International B.V.).

20.     CH2M Hill Companies, Ltd. publicly disclosed CH2M HILL International, Ltd. is CH2M's "holding company for operations outside of the United States."

21.     Public sources confirm that CH2M Hill Companies, Ltd. and CH2M HILL International, Ltd. performed CH2M work in Qatar, sometimes but not always via CH2M HILL International B.V.

22.     In 2012 CH2M was hired to be the Programme Management Consultant "to ensure the successful delivery" of the 2022 FIFA World Cup in Qatar by managing the massive construction projects necessary to host the event.  Pursuant to that construction management contract, CH2M was tasked with overseeing coordination with Qatari government agencies—all controlled by the Qatari regime—on large infrastructure projects for the World Cup, including the construction of nine new stadiums and the upgrade of three existing ones. CH2M Hill was also tasked with coordinating with Qatari government agencies and to monitor and provide assurance functions related to the construction of non-competition venues and major infrastructure projects that were needed for the World Cup. The construction and upgrade of these stadiums and related infrastructure is the "World Cup Construction Venture" or "Venture".

23.     CH2M had a unique corporate culture, which it has publicly disclosed was governed by foundational and core values captured in "*The Little Yellow Book*," written in 1978 by the firm's cofounder James Howland.  *The Little Yellow Book* was given to ***all employees worldwide*** on their first day.  CH2M's *The Little Yellow Book* espoused a view, which was

integrated across and among all of CH2M's business, regardless of which subsidiary did the work, that CH2M would do what the client wanted, stating explicitly "*[t]he client is king*," as underscored by this image, which *The Little Yellow Book* included:



On information and belief, CH2M's core value of kowtowing to its clients' desires was one of the reasons the Qatari regime, via the Supreme Committee, hired CH2M to oversee and manage delivery of the stadiums for the World Cup Construction Venture.

24.    Jacobs acquired CH2M in 2017, and the companies were integrated such that the two companies and their subsidiaries co-located their offices in Colorado and Texas.  Jacobs thereafter had offices in Colorado, in and through which Jacobs employees worked on the World

Cup Construction Venture.  Starting in the year after it acquired CH2M, Jacobs also disclosed publicly that it has offices in Qatar.

25.    After Jacobs acquired CH2M, all of CH2M's subsidiaries became wholly owned subsidiaries of Jacobs.

26.    Public sources confirm that Jacobs performed work in Qatar, sometimes but not always via CH2M HILL International B.V.

27.    CH2M and—starting in 2017—Jacobs managed and supervised construction for the entirety of the World Cup Construction Venture, including all stadiums—including, but not limited to, Al Thumama Stadium, Al Wakrah Stadium, Khalifa Stadium, Al Rayyan Stadium, and Lusail Stadium—and related infrastructure.  In this role, CH2M and Jacobs had significant access to the stadiums, influence over and oversight of the work done at the stadiums, managerial authority, auditing rights, and control over other companies that worked together to construct and deliver the stadiums for the World Cup Construction Venture.

28.    At all relevant times, Defendants practiced integrated one-firm business models such that each entity in the corporate form routinely collaborated with one another.  Jacobs and CH2M and their subsidiaries, through cross-functional teams that ensured that data, analysis, documentation, and the like were all shared seamlessly across and between them, as well as their affiliates, all operated as one.  Consequently, when one Defendant learned a material fact relating to the World Cup Construction Venture, it ordinarily would have and did share such information with the other Defendants.  And when another subsidiary of Jacobs or CH2M learned information, it would and did share such information with the Defendants.

29.     Jacobs's one-firm business model made it inevitable that Jacobs did work in furtherance of the World Cup Construction Venture in Colorado. Jacobs touts its "One Jacobs" business model, and according to Jacobs, "[o]ur integrated Business Management System (BMS) establishes the 'one Jacobs way' to ensure consistency and efficiency in internal operations and project delivery."[1]   Under Defendants' "One Jacobs" approach, to which Defendants always adhered, Jacobs Solutions Inc., Jacobs Engineering Group Inc., CH2M Hill Companies, Ltd., CH2M Hill International, Ltd., and CH2M HILL International B.V. routinely collaborated with one another and with Jacobs's and CH2M's other subsidiaries. This integrated work related to the World Cup Construction Venture was done in and through Jacobs's offices in Colorado. For example:

a. <u>Major Programs Teamwork in Colorado</u> – Jacobs employees and executives who were members of Jacobs's Major Programs and Urban Environment & Sports groups participated in the Venture, on information and belief while in Jacobs's offices in Colorado. For example, a U.S.-based dual-hat Jacobs and CH2M executive, Joseph Danko, was the Global Managing Director of CH2M's Urban Environment & Sports Group prior to Jacobs's acquisition of CH2M, and afterwards was Jacobs's Program Director, Sports and Entertainment. Mr. Danko stated publicly that he worked on the World Cup Construction Venture, and his work there related to "worker welfare standards." It is reasonable to infer that his work and Jacobs's benefit therefrom was done at least in part in the United States and from and through CH2M's (and then Jacobs's) offices in Colorado.

b. <u>Global Program Management Group Work in Colorado</u> – The Global Program Management Group was based, prior to Jacobs's acquisition, in Colorado, and still had teammates in Colorado after Jacobs acquired CH2M. That group met and made decisions related to the World Cup Construction Venture, and therefore participated in the venture, on information and belief, while in Jacobs's offices in Colorado. For example, Ken Degenhart, a Jacobs and CH2M dual-hatted "program manager" based in Colorado, worked on behalf of Jacobs and CH2M on the World Cup Construction Venture and, on information in belief, did so from Jacobs's offices in Colorado. Additionally, Jan Walstrom, a CH2M and then Jacobs employee at all relevant times based in Colorado, and currently an officer and director of Defendant

---

[1] Jacobs, FY21 ESG Disclosures, https://www.jacobs.com/sites/default/files/2022-04/FY21-ESG-Disclosures.pdf (last accessed Oct. 8, 2023).

CH2M Hill International Ltd., performed global and enterprise-wide "risk management" functions and, on information and belief, did work in furtherance of the World Cup Construction Venture from Jacobs's offices in Colorado.

c.    Global Integrated Delivery Teammates in Colorado – Jacobs has (and had at the time that it was working on the World Cup Construction Venture) a program it calls Global Integrated Delivery ("GID"), through which its Colorado employees, including Mechanical Engineers, Structural Engineers, Digital Delivery Leads, and Environmental Planners "partner[] across the globe" with Jacobs teammates abroad.  On information and belief, Jacobs employees in Colorado, as well as Jacobs executives, as part of this GID program, "support[ed] and engag[ed] with" personnel in Qatar and World Cup Construction Venture participants, and therefore participated in the Venture.

d.    Global Health and Safety Work in Colorado – Britt Howard, based in Colorado, was an Enterprise Director of Health, Safety, Security, Environment and Quality.  He worked for CH2M, and then for Jacobs after Jacobs acquired CH2M, and worked on projects globally.  On information and belief Mr. Howard worked on the World Cup Construction Venture on behalf of Jacobs from Colorado.

e.    Corporate Communications Work in Colorado – Lorrie Paul Crum, based in Colorado, worked in Jacobs's communications offices to which Jacobs directed any communications regarding violations of its labor Supplier Code of Conduct.  On information and belief Ms. Crum worked on the World Cup Construction Venture communications issues on behalf of Jacobs from Colorado.

f.    Monitoring of the Labor Supply Chain from Colorado – After it acquired CH2M, Jacobs had employees working on global labor supply-chain management who did work in furtherance Jacobs's pledge not to use forced or trafficked labor, on information and belief, from Jacobs's offices in Colorado.  For example, Holly Allen, a human resources specialist based in Colorado for CH2M and then Jacobs (after the acquisition), performed global functions related to employee analytics and, on information and belief, did work in furtherance of the World Cup Construction Venture from Jacobs's offices in Colorado.  Further, Taggert Hansen, a CH2M and then Jacobs employee based at all relevant times in Colorado worked on labor and employment issues for CH2M's and then Jacobs's global operations and, on information and belief, did work in furtherance of the World Cup Construction Venture from Jacobs's offices in Colorado.  Further still, Chris Mancinelli, a CH2M and then Jacobs employee based at all relevant times in Colorado performed international ethics and compliance investigations and, on information and belief, did work in furtherance of the World Cup Construction Venture from Jacobs's offices in Colorado.  Further still, Neal Thurston, while based in Colorado, was a CH2M employee who worked for Jacobs on integrating the two companies after the merger, had responsibilities for worldwide anti-corruption training and tracked international reporting and compliance data, and thereby on information and belief, did work in furtherance of the World Cup Construction Venture from Jacobs's offices in Colorado.

11

g.  Qatar Personnel Meetings in Colorado or with Colorado Personnel – Executives at CH2M and Jacobs who were integral to Defendants' participation in the World Cup Construction Venture, including but not limited to Rehan Khan, Amer Battikhi, Omur Akay, and Neil Reynolds met and made decisions related to the World Cup Construction Venture, and therefore participated in the Venture, on information and belief while in Jacobs's offices in Colorado.  Each of these individuals, and each other Jacobs direct or indirect employee, who traveled to the United States to perform work in furtherance of the Venture, made representations to the United States in immigration documentation, and those representations made in the United States were acts in furtherance of the Venture.

30.     Before Jacobs acquired CH2M, CH2M and each of its subsidiaries followed a globally-integrated business strategy, such that they each performed work in Colorado in furtherance of the World Cup Construction Venture.  Because CH2M's global headquarters were in Colorado, it is reasonable to infer that CH2M employees, executives, and its subsidiaries, including CH2M HILL International B.V., did work and took direction from CH2M in Colorado.  Brian Shelton, for example, was a CH2M and then Jacobs executive based in Colorado who also served as an officer of CH2M HILL International B.V. both before and after Jacobs acquired CH2M and its subsidiaries, and therefore did work on behalf of CH2M HILL International B.V. related to the World Cup Construction Venture from and through CH2M's and then Jacobs's offices in Colorado.  Additionally, CH2M's Center for Project Excellence, based out of Colorado, was meant to ensure uniform and global dissemination of technologies, procedures, project controls, and business methods, across and among all of CH2M's subsidiaries.  CH2M also had an "Ethics Ambassador program," which was designed to "provide[] employees with direct access to local senior leaders" at "every major office and project site" and who provided the vehicle for a "reliable way to connect our employees in the field to the home office [in Colorado], where ethics policies are set and preventive measures are enforced to ensure compliance."  CH2M also had an internal compliance lead in Denver that oversaw CH2M's subsidiaries' work in foreign locations.

12

Finally, CH2M utilized what it called "Matrix Organization" which was designed to allow employees to be deployed, regardless of which subsidiary was doing CH2M's work, based on capabilities and geographic expertise, and to freely exchange information and use any available resources throughout the entirety of CH2M's corporate structure. Each of these programs and employees, as well as each example CH2M employee listed *supra* ¶ 29, ensured that CH2M, prior to the Jacobs's acquisition, did work in furtherance of the World Cup Construction Venture in and from offices in Colorado. And it is therefore reasonable to infer, therefrom, that Jacobs's employees and executives did work in furtherance of the World Cup Construction Venture in and from Colorado, after Jacobs acquired CH2M and its subsidiaries. Finally, each CH2M direct or indirect employee who traveled to the United States to perform work in furtherance of the Venture made representations to the United States in immigration documentation, and those representations made in the United States were acts in furtherance of the Venture.

31.    These facts *supra* ¶¶ 26–30, and *infra* ¶ 60, demonstrate it is reasonable to infer that Jacobs and its subsidiaries, including CH2M HILL International, B.V., had interrelated operations, that were centrally controlled, with common management, and with common ownership or control, such that Jacobs should be held liable for the work of its CH2M HILL International, B.V. For example, Harry Sealy was a CH2M HILL International, B.V. employee working in Qatar on the World Cup Construction Venture who at all relevant times also worked for Jacobs as a "Global Technology Lead" and communicated using a Jacobs email address. Similarly, the fact that Jacobs executive Brian Shelton, while sitting in Colorado, was a director of CH2M HILL International, B.V. indicates that Jacobs and its subsidiaries mingled operations, employees, and executives, that Jacobs directly controlled each subsidiary, and that CH2M HILL International B.V. carried out

13

some of its operations, including but not limited to, on information and belief, work related to the World Cup Construction Venture, in Colorado.

32.     Further, these facts *supra* ¶¶ 26–31, and *infra* ¶ 60, show that Jacobs exercised a significant degree of control over CH2M Hill Companies, Ltd.'s, CH2M Hill International, Ltd.'s, and CH2M HILL International, B.V.'s, employee and employment, business strategy, and decision-making with regard to their work on the World Cup Construction Venture, such that these Jacobs subsidiaries were doing the work of Jacobs as agents of Jacobs.

33.     Further still, these facts *supra* ¶¶ 26–31, and *infra* ¶ 60, show that Jacobs exercised extensive control over the acts of CH2M Hill Companies, Ltd., CH2M Hill International, Ltd., and CH2M HILL International, B.V. (collectively, the "Subsidiaries"), related to their work and the harms caused to Plaintiffs on the World Cup Construction Venture.  On information and belief Jacobs owns all or the majority of the capital stock of the Subsidiaries, Jacobs and the Subsidiaries have common directors or officers, Jacobs finances the Subsidiaries, Jacobs pays the salaries or expenses or losses of the Subsidiaries, the directors and officers of the Subsidiaries take direction from Jacobs, and employees of Jacobs and the subsidiaries make no distinction between Jacobs and the Subsidiaries.  For all these reasons, the Subsidiaries were and are merely instrumentalities of Jacobs.

34.     At all relevant times, the participants in the World Cup Construction Venture included each of the Defendants, and others that include but are not limited to:

a.   Other subsidiaries of Jacobs and CH2M;

b.   The Supreme Committee for Delivery & Legacy ("Supreme Committee");

c.   *Fédération Internationale de Football Association*, d/b/a FIFA ("FIFA");

d.  Ashghal, Qatar's public works authority;

e.  Qatar Foundation;

f.  Thornton Tomasetti;

g.  AECOM;

h.  Turner International Middle East;

i.  TiME Qatar;

j.  Birdair;

k.  Taiyo Middle East;

l.  HBK Contracting;

m.  China Railway Construction Corporation;

n.  Foster + Partners;

o.  SIX Co.;

p.  Porr;

q.  Tekfen;

r.  Projacs International;

s.  VINCI;

t.  Tokyo Freight;

u.  J.A.K. Construction Builders;

v.  Al Jaber Engineering;

w.  Imar Trading and Contracting Company;

x.  Midmac Company;

y.  Habtoor Leighton Group;

z.  Electro Mechanical Enterprises Qatar; and

aa.  Rabban Readymix.

35.    Plaintiffs are Filipino construction workers who were trafficked to Qatar and whose coerced labor was used for construction project ventures, in which Defendants participated, for the 2022 FIFA World Cup in Qatar, *i.e.*, the World Cup Construction Venture. *See infra* V.E.

## IV.    SOURCING

36.    The factual allegations herein are based on an extensive investigation drawing on a broad array of public and non-public information, including evidence obtained from witnesses with direct and indirect knowledge, public reports and contract data, Defendants' (inclusive of their employees' and agents') admissions, statements and data relating to the other participants in the World Cup Construction Venture, including Qatar Foundation, U.S. government reports published to Congress under statutory directive, U.N. investigative reports, public investigations, reports, and documentaries published by NGOs, photos and videos, Qatari market data and regulations, public statements by U.S., U.N., and Qatari government officials, English- and Arabic-language media reports, scholarly analyses, think tank publications, and Plaintiffs' own recollections.

## V.    FACTS

### A.    The World Cup Construction Venture Engaged in Human Trafficking and Forced Labor.

37.    Qatar's economy relied on millions of migrant workers, comprising the vast majority of its labor force.

38.    Pursuant to the Qatari regime's (and Qatari employers') notorious system called "*kafala*" (sponsorship), migrant workers' visas were tied to their employers, which left workers dependent on their employers for their legal residency and status in the country.

16

39.     In Qatar, the *kafala* system made migrant workers vulnerable by granting Qatari employers broad and exploitative powers over migrant workers, allowing them to evade accountability for trafficking and forced labor abuses, and leaving workers beholden to debt and in constant fear of retaliation.  The *kafala* system also made workers depend on their employers not just for their jobs but also for housing and food.

40.     The Qatari regime's (and Qatari employers') *kafala* system was described in 2022 by the widely-followed soccer publication *Tifo Football*—in relation to the World Cup construction projects—as a form of "economic apartheid."  James Montague, author of numerous books and articles about soccer in the Middle East, explained in 2022,

> [t]here has perhaps ***never been a more controversial World Cup host.  Qatar has been rightfully criticised*** for its human rights record, how it won the World Cup bid and especially its treatment of migrant workers. In 100 years from now, humans will look back at kafala [] in . . . Qatar . . . ***as one of the great economic crimes of the twenty-first century***. (Emphasis added.)

41.     Zahra Babar, Associate Director for Research of Georgetown University's Center for International and Regional Studies, noted the ***direct causal relationship*** between the World Cup Construction Venture and horrific trafficking and labor abuses inflicted on migrant workers:

> ***From the initial stages***, human rights and migrants' rights practitioners ***drew a direct causal link*** between the awarding of the World Cup hosting rights to Qatar and the expansion of difficult, ***if not unendurable, working and living conditions for migrant workers***. (Emphasis added.)

42.     It was not until August 2020 that the Qatari regime introduced a law that ended the requirement for migrant workers to obtain their employer's permission to change jobs.  Until late 2020, to change jobs before the end of their contract, each migrant worker would have had to obtain a "No Objection Certificate" from their employer.

17

43.     Earlier in 2020, the Qatari regime ended its requirement that migrant workers obtain an "Exit Permit" to leave Qatar.  Before 2020, such a permit was required to depart Qatar.

44.     Prior to August 2020, the minimum wage in Qatar was only QR750, or approximately $210, per month.  2020 "reforms" required new minimum wage and food and housing allowances, designed to combat Qatari employers' widely known practice of forcing migrant workers in Qatar to live and work in inhumane conditions.  The new minimum wage plus food and housing allowance requires payment of QR1,800, or approximately $500, per month.

45.     The Qatari regime's 2020 "reforms" purportedly sought to effectively dismantle the Qatari regime's (and Qatari employers') *kafala* sponsorship system, which provided the basis for exploitation of forced labor throughout Qatar.  But even after these Qatari regime "reforms," there remained restrictions on leaving Qatar.  For example, many workers could not return home until the end of their two-year contract unless they were willing to both lose their jobs and pay for their way home.  In some instances, departing prior to two years of service required repaying the "finder's fee" that had been paid to the Filipino employment agencies or required that Plaintiffs pay the full cost to travel home, in contravention of what was promised during their recruitment.

46.     Prior to these "reforms," which still have not been fully implemented, migrant workers' physical movement and freedom were controlled by their employers.

47.     James Montague (the widely published soccer scholar) publicly reported in 2022 that "how these new laws were implemented meant that ***little changed on the ground*** for many workers" (emphasis added) as change related to employers' absolute rights over migrant labor has been slow to be implemented.

48. Additionally, and distinct from the *kafala* system, Qatari employers and labor supply companies frequently delayed, withheld, or arbitrarily deducted migrant workers' wages and/or overtime, or otherwise violated their contracts with migrant workers with impunity; they also frequently forced migrant workers to risk their safety, forced migrant workers to work through the night, sometimes as long as 36 hours straight, and forced migrant workers to live (when housing was provided) in inhumanely crowded, unsafe, and unsanitary conditions.

49. Additionally, and distinct from the Qatari regime's (and Qatari employers') *kafala* system, Qatari employers and labor supply companies had a commonly known practice of confiscating workers' passports, and then using possession of the passports to restrict workers' physical movement. By confiscating workers' passports, the companies prevented the workers from returning to their home countries until their contracts expired and restricted workers' ability to change employers in Qatar.

50. Qatari employers frequently forced migrant workers to work despite this treatment, and therefore exploited forced labor, by (a) taking migrant workers' passports from them; (b) imposing substantial debts—typically, by requiring the migrant worker to pay for the worker's own "recruitment fee," which they must pay off over time as they work; (c) denying migrant workers permission to return home unless they pay sums they cannot afford; and/or (d) threatening legal prosecutions. Qatar's construction industry was notorious for these types of exploitations of migrant labor, and Defendants knew or should have known that the World Cup Construction Venture would engaged in these types of exploitation.

51. In 2012, just as construction for the 2022 FIFA World Cup was set to begin, the acclaimed non-governmental organization Human Rights Watch published a landmark report

19

entitled ***Building a Better World Cup: Protecting Migrant Workers in Qatar Ahead of FIFA 2022*** ("2012 HRW Report") documenting pervasive employer exploitation and abuse of workers in Qatar's construction industry.  Defendants knew or should have known of the abuses detailed in the 2012 HRW Report and were on notice of the exploitative forced labor conditions detailed herein by 2012 when it was published.

52.    That year, Qatari Labor Undersecretary Hussein al-Mulla pledged that the government would replace the Qatari regime's (and Qatari employers') widely criticized *kafala* sponsorship system with a system requiring contracts between the employer and the worker.  Those "reforms" have not been fully implemented.

53.    The World Cup Construction Venture relied upon the Qatari regime's (and Qatari employers') *kafala* system in its construction contracts, and specifically for its subcontracted labor, and Defendants knew or should have known.

54.    In addition to the foregoing, all the examples that follow, *generally* V.C, demonstrate that the World Cup Construction Venture relied upon the trafficked and forced labor of Plaintiffs, as well as untold thousands of others.

### B.    Defendants Participated in the World Cup Construction Venture.

55.    In 2010, the Qatari regime won the bid to host the 2022 FIFA World Cup.  It did so through the payment of massive bribes to a host of actors.  *See infra* ¶¶ 72, 99, 105.

56.    The Qatari regime then assigned the Supreme Committee with direct responsibility for building competition venues.  This included responsibility for building the proposed stadiums and training sites, as well as responsibility for coordinating and monitoring non-competition venues required by FIFA, major infrastructure improvements, such as to the New Doha

International Airport and the proposed nationwide metro network, and building road infrastructure for all these stadia and facilities as well as major expressways, ring roads, and highways throughout the area of Qatar in between the stadia. Although some of these non-stadium infrastructure projects were to be delivered by other Qatari public entities—such as Ashghal, the Qatari public works authority—the Supreme Committee was nevertheless responsible for the overall project management plan for the entire Venture and for coordinating and monitoring these related infrastructure projects.

57.    In February 2012, the Qatari regime, through the Supreme Committee, hired CH2M to oversee and manage delivery the World Cup Construction Venture.  CH2M was paid to act on the Supreme Committee's behalf—and therefore, on the Qatari regime's behalf—to oversee construction of all stadiums and to monitor and provide assurance and support for the construction of related infrastructure[2] for the 2022 FIFA World Cup.

58.    Pursuant to the contracts entered into by all contractors and subcontractors in the World Cup Construction Venture, including but not limited to the companies that directly employed Plaintiffs, CH2M's (and eventually Jacobs's) responsibility was to oversee and manage the Venture.  CH2M (and eventually Jacobs) thereby participated in the World Cup Construction Venture by, among other things, assisting, supporting, managing, overseeing, auditing, and facilitating it.

---

[2]    References throughout this complaint to Venture "infrastructure" necessarily includes substantial road, expressway, and highway projects. That part of the Venture was diverse and wide-ranging, and includes stadium access roads at each stadium site, the Al Khor North Road, the Al Khor Link Road, the Al Khor Expressway, several roads around Al Rayyan, the Al Wakrah F Ring Road, the Al Wakrah EW Corridor, the Al Wakrah Bypass, the Al Wakrah Main Road, several roads around Khalifa, the Lusail Expressway, Lusail External Roads, the Orbital Highway and connecting roads, as well as other major roads within central Doha such as the Al Bustan roads.

59.     As overseer and manager of the World Cup Construction Venture, CH2M (and eventually Jacobs) was responsible for ensuring that proper labor standards and practices were followed by contractors and subcontractors in the Venture.

60.     After acquiring CH2M in 2017, Jacobs admitted it was responsible for overseeing and managing the delivery—and therefore participated in by assisting, supporting, and/or facilitating—of the entire World Cup Construction Venture.  For example:

a.  In 2018, Steven Demetriou, then Chairman and CEO of Jacobs Engineering Group, publicly stated that "we consider the acquisition of CH2M an opportunity to enhance our human rights program even further," "Jacobs recognizes the significance of CH2M's leadership on human rights and has already begun working to harmonize the companies' programs," and "[w]e are currently in the process of updating Jacobs' Code of Conduct and Supplier Code of Conduct to provide an integrated policy framework for our combined company."

b.  During an earnings call in 2018, Mr. Demetriou said, in relevant part, "we got super excited about 2019 and beyond because by that time, we'll have had the time to really leverage the revenue synergies that we've been talking about," and "the iconic programs that we've talked about several times really showed in some of the Middle East activities they have working on . . . [like] the Qatar World Cup 2022, and now being able to put these capabilities together, and I just gave you just a small sampling of what excites us that's going to cut across all three of our new lines of business as it relates to growth."

c.  In its 2021 publication entitled *FY21 Jacobs Climate Risk Assessment*, Jacobs stated in relevant part that Jacobs had "developed specific climate models for the locations of the FIFA World Cup Qatar 2022."

d.  In February 2022, Jacobs announced in a press release that it had "brought extensive project and program management consultancy experience from major programs around the world including . . . the FIFA World Cup Qatar 2022."

e.  In March 2022, Jacobs stated in a publicly available document that Jacobs "[is] a world-leader in running major program delivery, partnering with our clients to oversee the execution of mega projects [including] FIFA World Cup venues in Qatar."

f.  In December 2022, Jacobs stated publicly that Jacobs was the "delivery partner" for the World Cup Construction Venture, and had been so for "the last decade":



In response to Jacobs's corporate post, in the comments under it, Omur Akay, who was CH2M's Executive Program Director for the World Cup Construction Venture, confirmed Jacobs's participation in the Venture: "I solute [sic] the [CH2M] team that set the initial management program then ***successfully carried over by great people under Jacobs management***."

g.  In another Jacobs promotional material, Jacobs stated in relevant part "Jacobs leveraged its experience delivering successful major programs including the . . . ongoing FIFA World Cup Qatar 2022 . . . ."

h.  Jacobs's website, currently accessible (last accessed September 26, 2023) at https://www.jacobs.com/locations, states in relevant part that it "deliver[ed] whole-system solutions" for the World Cup:

> Our visionary team in Qatar provides environmental, industrial and advanced technology, urban development, water and nuclear services. With a history of delivering whole-system solutions, they solve complex problems that include environmental, social and economic sustainability as an integral part of their approach. The FIFA World Cup 2022™, Doha Metro, and **Doha South Sewage Infrastructure Program** are three examples of such programs that require an integrated approach to deliver the vision.

i.  Former and current Jacobs employees, including but not limited to Rehan Khan, Phillip Shaw, Mohammed Razzaq, and Sebastian Lourdusmay, publicly hold themselves out as having worked on the World Cup Construction Venture on behalf of Jacobs.  For example, Mr. Khan's profile on LinkedIn states that he is based in the United States, has been a Vice President and Country Director for Jacobs since December 2017, and was during that time the Executive Program Director for the Qatar 2022 FIFA World Cup Programme.  Mr. Khan worked for CH2M prior to Jacobs's acquisition of CH2M, and was CH2M's Country Director & Executive Programme Director for the World Cup until Jacobs acquired CH2M.  Further, Mr. Shaw's LinkedIn profile states that he was a "health and safety" manager for the FIFA World Cup 2022 project for Jacobs, starting in 2017.

j.  Former CH2M employees Sheila Icaro, Fahmi Abul Feilat, Dinisio Aldrin Bantaculo, and Miro Imsirovic publicly hold themselves out as having been employed directly by CH2M in Qatar working on the World Cup Construction Venture.  Ms. Icaro discloses she worked for CH2M Hill International BV as an "HR Generalist" tasked with being "Administrator and On-boarding and Mobilisation Lead on major projects in Qatar" including the "Qatar 2022 FIFA World Cup."  Abul Feilat was employed from 2019 to 2021 by "CH2M Hill International BV" on "World cup 2022 program" as a "Project Management Specialist."  From 2013 to 2015, Bantaculo discloses he worked for CH2M Hill International BV as "PMC Planning & Scheduling Engineer for Qatar 2022 FIFA World Cup Programme."  Mr. Imsirovic publicly discloses that he worked for CH2M in Doha since 2011 and worked on expressways, the Al Wakrah Bypass, the Ring Road, and Lusail infrastructure, and lists as his responsibilities at

24

that time ""[s]upervis[ing] actual progress of work" and "coordinat[ing] the work of contractors."

61.    A former Jacobs employee has also confirmed Jacobs participated in the World Cup Construction Venture, and described exactly how that participation worked, at least as regards the work they did.  They worked on the ground in Qatar and served as the Precinct Health, Safety, and Environment Manager for Jacobs's client, the Supreme Committee, at Al Thumama Stadium.  This former Jacobs employee disclosed, *inter alia*, that:

a.  The former Jacobs employee worked at Al Thumama stadium on behalf of Jacobs from 2017 (the year that Jacobs acquired CH2M) until 2021;

b.  "Tekfen-*Al Jaber Engineering Joint Venture*"—the venture on which the former Jacobs employee worked, specifically notable because Al Jaber Engineering was the direct employer to almost one-third of the Plaintiffs named in this Complaint—"ha[d] been awarded the contract by the Qatar Supreme Committee for Delivery and Legacy [] for the turnkey delivery of the engineering and construction work" for the Al Thumama Stadium;

c.  The former Jacobs employee's responsibilities included directly overseeing subcontractors' contract compliance:  The employee "[w]ork[ed] on [Jacobs's] client's behalf to *ensure all [environment, health, and safety] activities [were] carried out by the CSC and contractor in accordance with the contract* . . .;

d.  The former Jacobs employee's work included making regular site visits and inspections, including *weekly* "safety tours";

e.  Jacobs's role in the Venture was to monitor, direct, and control the labor supply chain, including at Al Jaber Engineering, because the former employee was tasked with "ensur[ing] all" health, safety, and environment "expectations" and health, safety, and environment "culture" were "*implemented* as per regulatory and client requirement" and "*advise[d] the supply chain on corrective actions*" as they "*monitor[ed]*" the Venture's "*contractor's compliance* with Construction phase health and safety Plan"; and

f.  Jacobs's role in the Venture was to oversee and monitor everything—and the former Jacobs employee's job was in part to "[e]nsur[e] policy, objectives, targets and standards [were] measured, and recorded to ensure that the highest possible health and safety standards [were] maintained *in line with* client procedures, [and] *contract requirements*."

25

The reasonable inference, therefrom, is that Jacobs had similar employees at each of the stadium construction projects included in the World Cup Construction Venture, and held positions monitoring and controlling the subcontractors that employed each Plaintiff in this Complaint.

62. As to the non-competition venues and related infrastructure, the Programme Management Contract provides that CH2M Hill would perform coordination and monitoring functions with other entities (such as the public works agency Ashghal) responsible for the delivery of those projects and would work with the Supreme Committee to recommend corrective action to ensure that those infrastructure projects would be delivered in accordance with FIFA requirements. Ashghal and other agencies employed contractors such as Habtoor Leighton Group in order to deliver Venture projects such as the major road infrastructure needed for the tournament.

63. CH2M, and then also Jacobs after it acquired CH2M, therefore had continuous business relationships with the other companies in the World Cup Construction Venture, including those that directly employed Plaintiffs, and through those continuous business relationships Defendants facilitated successful operation of the World Cup Construction Venture.

**C.    Defendants Knew or Should Have Known the World Cup Construction Venture Engaged in Human Trafficking and Forced Labor.**

64. Defendants knew or should have known that the World Cup Construction Venture employed migrant laborers pursuant to the then-prevalent Qatari *kafala* system, commonly known Qatar construction industry practices, and widely known public and governmental reports.

65. At all relevant times it was widely known in the United States, Europe, Qatar, and the Philippines, all of which comprised locations where Defendants conducted business, that the Qatar construction industry relies and relied upon trafficked and forced labor, that the World Cup Construction Venture used trafficked and forced labor in a way that was not materially different

from how it was otherwise customary in Qatar, and that Filipinos—in particular—were one of the groups most at risk to be trafficked and subjected to forced labor by Qatari employers in Qatar.

66. Defendants knew or should have known that the World Cup Construction Venture would and did exploit trafficked and forced labor of Filipino laborers like Plaintiffs. Specifically, Defendants knew or should have known that workers would be lied to about the terms and conditions of their employment and living conditions; that workers' passports would be and were retained; that workers would be forced to work inhumane and unsafe hours, sometimes without compensation; and that workers would be and were forced to live in unsafe and unsanitary conditions.

67. Defendants knew these widely understood facts, as well as the other local-Qatar-knowledge-based allegations in this Complaint, in part through their Qatar-focused and/or Qatar-deployed employees' and local agents' local knowledge. Defendants had hundreds of employees in Qatar. Defendants each relied in part on Qatar-knowledgeable employees (including their in-house corporate security and intelligence personnel, *see infra* V.C.3) and local agents in Qatar to keep them abreast of Qatari market conditions and knowledgeable regarding the true nature of the Qatari regime's (and Qatari employers') notorious sponsorship of human trafficking and forced labor in the Qatari construction industry and the World Cup Construction Venture. Generally, Defendants' Qatar-knowledgeable employees and agents spoke fluent English and often proficient and/or fluent Arabic, had relationships with people in the Qatari locations in which the Venture conducted business, and were well-informed about local conditions. These agents (who were subject to Defendants' control and whose knowledge is imputed to Defendants) knew that the World Cup Construction Venture engaged in systematic human trafficking and that any

27

commercial actor who participated in it would necessarily benefit from trafficked and forced labor, including the abuses Plaintiffs allege.

68.    As set forth below, from the beginning, and then time and again throughout the entirety of the duration of Defendants' participation in the World Cup Construction Venture, Defendants knew or should have known about the trafficking and forced labor that would and did occur, including that such misconduct was likely occurring with respect to the Venture's employment of Plaintiffs.

### 1. Public Reports Published by the U.S. Government, Non-Governmental Organizations, Media, and Documentarians

69.    Defendants knew or should have known about the extreme trafficking and forced labor risks related to their participation in the World Cup Construction Venture because public reports alerted Defendants to such risks before they began participating in the Venture (while they were deciding whether to participate) and then afterwards throughout the period in which they participated in the Venture. Reports supporting an inference of Defendants' knowledge are legion, and included, but were not limited to, widely publicized reports authored by the United States, respected NGOs, mainstream media outlets, and documentarians.

70.    **U.S. Government reports** alerted Defendants that they were participating in a trafficking venture and, at a minimum, support an inference of Defendants' knowledge. Such reports included, but were not limited to:

a. <u>U.S. Department of Justice</u>. In 2008, the U.S. Department of Justice published a report that alerted Defendants that "[a] significant number of Filipino men and women who migrate abroad for work are subjected to conditions of involuntary servitude in . . . Qatar." At the time, the United States placed Qatar on the "Tier 3" list of governments making little effort to address modern slavery.

28

b.  U.S. Department of State.  On June 20, 2014, the Department of State published its statutorily mandated report, *Trafficking in Persons Report 2014*, which classified Qatar as a "Tier 2 Watch List" country because it did "not fully comply with the . . . minimum standards" of the TVPRA.  This report alerted Defendants that "Qatar [was] a destination country for men and women subjected to forced labor. . . .  Approximately 1.2 million men and women . . . voluntarily migrate[d] to Qatar to work . . . primarily in the construction, oil and gas, service, and transportation industries . . . but many subsequently face[d] forced labor."  Thereafter, Qatar remained a "Tier 2 Watch List" country in 2015 and 2016.

71.    **NGO reports** alerted Defendants that they were participating in a trafficking venture and, at a minimum, support an inference of Defendants' knowledge, and such NGOs sometimes even directly contacted Defendants.  Examples included, but were not limited to:

a.  Human Rights Watch.  In 2012, the year CH2M was appointed to oversee delivery of facilities and infrastructure for the 2022 FIFA World Cup, Human Rights Watch sent letters to the Supreme Committee *and CH2M* regarding slave labor in Qatar's construction industry.  CH2M responded at that time that it understood the risk and would have a "zero-tolerance policy for the use of forced labor or other human trafficking practices."  In June 2012, Human Rights Watch published the 2012 HRW Report, *see infra* ¶ 51, which alerted Defendants that "the deeply problematic working conditions of migrant workers throughout the country mean that realizing Qatar's World Cup vision may depend on their abuse and exploitation unless adequate measures are taken to address the human rights problems widespread in the construction industry in Qatar."  The 2012 HRW Report also documented exorbitant fees required to obtain jobs, which led to debt servitude, unsafe and unhealthy working conditions, overcrowded, unsanitary, and inhumane living conditions, passport confiscations, and delayed, reduced, or denied pay.  The 2012 HRW Report concluded that many of these construction workers are "very likely to be in conditions of forced labor, as defined by international law."

b.  Amnesty International.  In 2013, Amnesty International released a report entitled ***The Dark Side of Migration: Spotlight on Qatar's Construction Sector Ahead of the World Cup***, which concluded that migrant workers are subject to forced labor or modern slavery and exploited throughout the construction industry hierarchy, including abuses by subcontractors and multinational corporations overseeing the World Cup Construction Venture.

c.  International Trade Union Confederation.  In 2014, Sharan Burrow of the International Trade Union Confederation testified, before a European Parliament hearing regarding migrant slave labor, that companies who "are bidding for the billion dollar infrastructure developments in Qatar" should be held "to account" for doing so.

d.  Verité.  In 2017, the year that Jacobs acquired CH2M and thus assumed responsibility for the World Cup Construction Venture, Verité, "a global NGO with a mission to ensure that people around the world work under safe, fair, and legal conditions," published a 355-page report,

***Strengthening Protections Against Trafficking in Persons in Federal and Corporate Supply Chains: Research on Risk in 43 Commodities Worldwide***.  In the section entitled "Labor Abuse in Construction Facilities for the World Cup," the report stated that "[a]n investigation into the working conditions in Qatar during preparations for the 2022 FIFA World Cup has found evidence of severe abuse of migrant laborers and indicators of human trafficking."  The report detailed evidence of withheld pay and passports to restrict workers from leaving, unsafe worksites, inhumane living conditions, and debt servitude with usurious interest rates.

72.    **Media reports** alerted Defendants that they were participating in a trafficking venture and, at a minimum, support an inference of Defendants' knowledge, and such reports sometimes even directly referenced Defendants.  Examples include, but are not limited to:

a.   *Equal Times*.  In December 2012, *Equal Times*, a "global news and opinion website focusing on labour [and] human rights," published a "Special Report" entitled ***Qatar: Grand Ambitions, Wretched Lives***, which alerted Defendants by including a collection of articles about Qatar's history of exploiting migrant workers and Qatar's *kafala* system.  *Equal Times* warned that the construction companies building stadiums and infrastructure for the 2022 FIFA World Cup claimed to be committed to social responsibility but "***in practice these companies do little to ensure human and labour rights for migrant workers, especially within their supply chains***."  (Emphasis added.)

b.   *The Guardian*.  Reports by the *Guardian* regularly alerted Defendants to the anti-trafficking risks attendant to their services.  In December 2012, the *Guardian* published the first of many articles regarding the exploitation of migrant laborers working in Qatar on the World Cup Construction Venture.  Later in 2013, the *Guardian* published an article entitled ***No Respite for Qatar's Migrant Workers, International Trade Union Finds***, which reported that a delegation from the International Trade Union Confederation found there had been no improvement in living and working conditions for migrant workers working on the World Cup Construction Venture, detailed employers' practice of withholding salaries and passports to prevent workers from leaving the country, and quoted a trade union official to say "***International companies should be on notice*** about the reputational risk of doing business in Qatar without respect for workers' rights."  (Emphasis added.)  Also in 2013, the *Guardian* published another article (entitled ***Qatar's World Cup "Slaves"***), which found "[e]vidence of forced labour on a huge World Cup infrastructure project" and detailed labor abuses, confiscated passports, inhumane living conditions, and debt servitude, and warned that the migrant laborers coming to Qatar to help build the World Cup facilities were uniquely vulnerable to exploitation.  In 2014, the *Guardian* published another lengthy investigative report, headlined ***Modern-Day Slavery - Qatar World Cup: Migrants Wait a Year to Be Paid for Building Offices***.  The *Guardian*'s series of reports was entitled ***Modern-Day Slavery in Focus: Qatar***.

30

c. *The Economist*.  In 2013, the *Economist* published a report about migrant laborers readying Qatar for the World Cup, which detailed exorbitant recruitment fees, unfair labor practices, and the problems with exploitation related to Qatar's *kafala* system.  The *Economist* concluded that many workers could be classified as "victims of trafficking."

d. *New York Times*.  In 2015, the *New York Times* published a report that also explicitly alerted Defendants by calling out CH2M's then participation in labor abuses related to the World Cup construction projects.  Specifically, the *Times* reported that there had been "[s]crutiny" regarding "labor abuses involving foreign laborers, including during construction in Qatar for the 2022 FIFA World Cup. . . . American construction firms, including CH2M . . . manage or oversee those projects. . . . [A]n official of Amnesty International testifying at a Senate subcommittee hearing on the FIFA corruption scandal said [CH2M] had an obligation to address the conditions faced by such workers, which reports have described as akin to indentured servitude."

e. *Vox*.  In 2015, *Vox* published an article entitled ***The World Cup's Biggest Issue: Modern Slavery and Dead Workers***, which said in relevant part "FIFA officials ***must have known*** that giving hosting rights to Qatar would have ***directly and undeniably meant funneling money to one of the most horrific construction sectors in the world***."  (Emphasis added).  The article discussed how, even though "[w]orking conditions are . . . horrendous," construction workers could not change jobs because their employers hold their passports.  Indeed, the construction workers working on the World Cup Construction Venture were reported to be "***prevented from leaving the company or the country***" and "***forced to work in impossibly hot weather and conditions that virtually guarantee some will die***."  (Emphasis added).  The report also noted "[s]ome numbers suggest a direct link between the death toll and the World Cup," and concluded "FIFA chose to give the World Cup to Qatar.  That means it owns the migrant worker program."

f. *Wall Street Journal*.  In 2015, the *Wall Street Journal* published an article entitled ***Qatar Called to Publish World Cup Worker Death Figures***, which discussed the "renewed allegations of labor abuse" as the "latest controversy to mar Qatar's plans to host" the World Cup.  Citing a representative from the International Trade Union Confederation, the article noted "up to 500 construction workers a year could die due to limited access to health services and poor working and living conditions that might prompt heat-related illnesses, stress-induced heart attacks and work-related falls and injuries."  And the article noted that "rights officials" have "called on the Qatari government to address the allegations of abuse" endured by "migrant workers."

g. *Fox News*.  In 2016, *Fox News* published an article entitled ***Critics Call Foul as Qatar's 2022 World Cup City Built With "Slavery."***  Addressing the construction of World Cup infrastructure in Qatar, including Lusail Stadium, *Fox News* reported that Qatar's "migrant workforce faces deadly conditions, miserable accommodations and low wages."  Quoting a representative from the International Trade Union Confederation, the article stated that "'[c]onditions in camps are simply inhuman.'"  "'FIFA,'" according to that same person, "'is ***content for the World Cup to be built on modern slavery***.'"  (Emphasis added.)

31

73.      On top of the above, the media also reported about the corruption scandal related to Qatar winning the bid to host the World Cup, and detailed one of the greatest corruption scandals in recent world history.  The corruption scandal is yet another reason Defendants knew or should have known that the World Cup Construction Venture would and did engage in trafficked and forced labor.  Indeed, media articles *made the connection*.  For example, *Vox* reported in 2015 that while "Swiss prosecutors" had recently "begun an investigation into possible corruption in the bidding process that awarded Qatar the 2022 World Cup," "***one scandal involving the Qatar games [was] already obvious: the widespread and vast abuse of migrant workers***."  (Emphasis added.)  Similarly, *CNN* reported in 2014 that "new allegations" of corruption in the hosting-bid process came after "a slew of negative reports surrounding Qatar's hosting of the 2022 World Cup finals," including "[a]llegations of migrant worker abuse under the so-called kafala system of sponsorship, which has been heavily criticized by international human rights groups."

74.      Media reports, at the time, also regularly described the practices at the World Cup Construction Venture as "slavery."  Examples of such reporting include, but are not limited to:

a.  *The Guardian*.  In 2013, the *Guardian* reported—in an article entitled ***Revealed: Qatar's World Cup "Slaves"***—that migrant workers in Qatar "face[d] exploitation and abuses that amount[ed] to *modern-day slavery*."  (Emphasis added.)

b.  *USA Today*.  In 2015, *USA Today* published an article—entitled ***FIFA Must Pull Cup Out of Qatar***—reporting that, "[a]s for migrant workers, the kafala sponsorship system is *just a fancy term for slavery*."  (Emphasis added.)

c.  *Huffington Post*.  In 2016, *Huffington Post* reported—in an article entitled ***Report Tells FIFA To Protect Human Rights Or Move World Cup From Qatar***—that "Amnesty International recently interviewed more than 200 migrant workers to document human rights abuses at these construction sites. The global human rights group criticized FIFA for not pressuring Qatar to implement promised reforms, leaving intact a labor system that other groups have likened to *'modern slavery.'*"  (Emphasis added.)

d. *Ottawa Citizen*.  In 2016, the *Ottawa Citizen* reported, in an article entitled **Qatar, 2022: Where We'll Play Sports in the Place Built by Slaves**: "The 2022 World Cup is **driving more demand for slavery**.  Many migrants killed by the job, many more living squalidly, no one meaningfully protected from being forced to stay somewhere against their will."  (Emphasis added.)

e. *CNN International*.  In 2016, CNN reported that "Qatar actually commissioned a report by an international law firm **about two years ago**, which said very clearly that the kafala system, or the sponsorship system can facilitate and drive **modern-day slavery**."  (Emphasis added.)

75.    **Television Reports and Documentaries** also alerted Defendants—through stark videos and photos—that they were participating in a trafficking venture and support an inference of Defendants' knowledge.  Several prominent news outlets, investigative journalists, and non-governmental organizations released detailed news segments and published documentary videos that addressed the squalid conditions in which migrant construction workers in Qatar lived, highlighting labor abuses related to the World Cup Construction Venture.  A non-exhaustive list of such reports follows:

| Broadcaster / Program | Title of Segment About Labor Abuses in Qatar and Trafficking and Forced Labor by World Cup Construction Venture | Year |
|---|---|---|
| International Trade Union Confederation | **Hidden Faces of the Gulf Miracle**<br>https://tinyurl.com/mrxuw5mp (last accessed October 11, 2023) | 2011 |
| The *Guardian* / *Guardian* Online | **Qatar World Cup 2022: Migrant Workers Forced to Work for No Pay**<br>https://tinyurl.com/6jddprue (last accessed October 11, 2023) | 2013 |
| HBO / Last Week Tonight (with John Oliver) | **FIFA and the World Cup**<br>https://tinyurl.com/389shwcc (last accessed October 11, 2023) | 2014 |
| ESPN / E:60 | **Qatar's World Cup**<br>https://tinyurl.com/3sy66dtt (last accessed October 11, 2023) | 2014 |

33

| Broadcaster / Program | Title of Segment About Labor Abuses in Qatar and Trafficking and Forced Labor by World Cup Construction Venture | Year |
|---|---|---|
| The *Guardian* / *Guardian* Online | ***Qatar World Cup: Migrants Wait a Year to be Paid for Building Offices***<br>https://tinyurl.com/3kd8c3e5 (last accessed October 11, 2023) | 2014 |
| BBC / BBC News | ***"Forced Labour" at Qatar World Cup Site***<br>https://tinyurl.com/bdertvsn (last accessed October 11, 2023) | 2016 |
| Amnesty International | ***Investigating Conditions in Qatar Migrant Camps***<br>https://tinyurl.com/43cz8ebk (last accessed October 11, 2023) | 2016 |

76.    Such video coverage spanned the political spectrum.  For example, MSNBC's *All In With Chris Hayes* broadcast a piece entitled ***FIFA Corruption Scandal*** in 2015, https://tinyurl.com/46xd6vpy (last accessed October 11, 2023), which stated in relevant part that "[t]he situation is extraordinarily grim in Qatar where ***migrant workers are building World Cup stadiums in slave-labor conditions, with hundreds, perhaps thousands, dying in the process***." Similarly, in a segment titled ***FIFA Sponsors Voice Concerns in Wake of Corruption Scandal***, which aired in 2015, https://tinyurl.com/3sxn4tz2 (last accessed October 11, 2023), *Fox News* observed: "[l]ook at the Qatar World Cup.  Hundreds of immigrant workers have died building World Cup stadiums there."

77.    Moreover, news outlets, investigative journalists, and non-governmental organizations published (and republished) imagery that revealing the squalid and inhumane conditions of migrant construction workers' lives in Qatar, such as the following examples:

a. Sleeping quarters for migrant workers during World Cup Construction Venture (*Guardian*, July 2014):[3]



---

[3] This video can be seen on the *Guardian*'s website where it hosts its news item entitled "Qatar World Cup worker: 'I want to go home but I don't have any money,'" (July 28, 2014) ("Qatar World Cup Video"), *available at* https://tinyurl.com/43ww2njy (last accessed October 11, 2023).

b.  Restrooms provided to migrant workers during World Cup Construction Venture (*Guardian*, Qatar World Cup Video, July 2014):



c.  Group kitchen provided to migrant workers during World Cup Construction Venture (*Guardian*, Qatar World Cup Video, July 2014):



d.  Group bathing area for migrant workers during World Cup Construction Venture (*Guardian*, Qatar World Cup Video, July 2014):



e.  Toilet-stall bathing area for migrant workers during World Cup Construction Venture (*Guardian*, Qatar World Cup Video, July 2014):



f.  Toilet-stall bathing area for migrant workers during World Cup Construction Venture (*Guardian*, Qatar World Cup Video, July 2014):



g.  Housing for migrant workers during World Cup Construction Venture (Amnesty Int'l, March 2016):



h.   Successful attempt to shut down interview, by World Cup Construction Venture participant, when interviewee was asked about the Venture's use of migrant labor to build the stadiums (*Guardian*, Qatar World Cup Video, July 2014):



78.    Defendants knew the sum and substance of each publicly available U.S. government, NGO, media, and documentary report referenced throughout this Complaint for at least four reasons. *First*, media outlets in the United States, Europe, the Middle East, and Asia routinely published, and republished, such reports, which on information and belief Defendants' U.S. and overseas employees and agents regularly reviewed in the normal course of work for Defendants (and whose resulting knowledge is imputed to Defendants). *Second*, on information and belief, Defendants' internal corporate security and intelligence departments, *see infra* V.C.3, ordinarily monitored, and recirculated, such public reports in the normal course of their work for Defendants, ensuring that Defendants knew, or should have known, of such reports. Indeed, mass collection and analysis of open source data like government, NGO, and media reports are core functions of corporate security and intelligence functions at large, data-driven, multi-national

corporations like Defendants.  *Third*, on information and belief Defendants' due-diligence operations alerted them to these reports, *see infra* V.C.4.  *Fourth*, on information and belief, Defendants were at times asked to comment on such stories pre- or post-publication, which further alerted Defendants to the human trafficking and forced labor risks associated with the World Cup Construction Venture.

### 2.  Google and Wikipedia

79.    Defendants also knew or should have known that they were participating in a trafficking venture because two of the most widely used, free, and generally accurate research tools online alerted Defendants that their participation in the World Cup Construction Venture benefited from the trafficking and forced labor of persons like Plaintiffs: (1) Google; and (2) Wikipedia.

80.    **Google** products alerted Defendants that they were participating in a trafficking venture and, at a minimum, support an inference of Defendants' knowledge.  On information and belief, Defendants' (inclusive of their employees' and agents') use of Google products alerted Defendants to the relevant trafficking risks in two ways.

81.    *First*, on information and belief, one or more of Defendants' officers, directors, managers, employees, and/or agents who worked for Defendants in connection with the World Cup Construction Venture conducted searches on Google's proprietary search engine relating to human trafficking and forced labor in Qatar and/or human trafficking and forced labor by any participant in the Venture (*i.e.*, they "Googled" it).  In so doing, Defendants were inundated with credible reports, including on information and belief many of such reports referenced herein, confirming that employers in Qatar widely, and systematically, engaged in trafficking and forced labor, and that migrants employed by the Venture were victims of trafficking and forced labor.

40

82.     *Second*, on information and belief, one or more of Defendants' officers, directors, managers, employees, and/or agents who worked for Defendants in connection with the World Cup Construction Venture used Google's "Notification" feature—in which a person can identify any word or phrase and automatically receive a Google-generated email containing a link to any article that pings on such word or phrase after the person signs up—to receive automatically generated emails from Google (a "Google Alert") relating to words like "Jacobs Engineering," "Qatar," "World Cup," and/or "human trafficking."[4]  Each person who acted for Defendants and signed up for such Google Alerts was likely inundated with credible media reports, including on information and belief many of the reports referenced herein, confirming that employers in Qatar widely and systematically engaged in trafficking and forced labor, and that migrant workers employed by the Venture were victims of human trafficking and forced labor.  That is because Google's artificial intelligence-based algorithms captured each public report identified by Plaintiffs in this Complaint; accordingly, it is likely Google emailed the link to many such public reports to Defendants' personnel as a "Google Alert."

83.     **Wikipedia** also alerted Defendants that they were participating in a trafficking venture and, at a minimum, support an inference of Defendants' knowledge.  Such Wikipedia pages included, but were not limited to:

a.  The contemporaneous version of the "2022 FIFA World Cup" Wikipedia page prominently noted that Qatar has been "the subject of *intense criticism* because of the way it has handled many of the construction projects; *hundreds of workers have died* since the country was

---

[4] Plaintiffs' belief is based upon common practices in every white-collar industry, in which professionals routinely set up "Google Alerts" on items relating to their work.  Given Defendants' scale, general industry practices, and the intense public focus on the World Cup Construction Venture, it would be implausible that not even one of Defendants' officers, directors, managers, employees, and/or agents who worked for Defendants in connection with the World Cup Construction Venture ever set up Google Alerts to help them do their jobs.

awarded the competition in 2010."   Wikipedia, "2022 FIFA World Cup" (Jul. 9, 2014) (*available at* https://tinyurl.com/bp9w28h6) (emphasis added).   The page's "Concerns and controversies" subsection noted one investigation found that "many workers are denied food and water, have their identity papers taken away from them, and . . . are not paid on time or at all, *making some of them in effect slaves*."  *Id.*  (emphasis added).

b.  The contemporaneous version of the "Human rights" subsection of the "Qatar" Wikipedia page stated: "Qatar is a destination for men . . . who migrate willingly, but are *subsequently trafficked into involuntary servitude* as domestic workers and labourers."  Wikipedia, "Qatar" (Oct. 4, 2011) (*available at* https://tinyurl.com/ywxxc5kf) (emphasis added).   "The most common offence was forcing workers to accept worse contract terms than those under which they were recruited.  Other offences include bonded labour, withholding of pay, restrictions on movement, arbitrary detention, and physical, mental, and sexual abuse."  *Id.*  Citing the U.S. State Department's *Trafficking in Persons Report*, the Wikipedia page continued: "men and women who are lured into Qatar by promises of high wages are often forced into underpaid labour" and "laws against forced labour are rarely enforced."  *Id.*

c.  The contemporaneous version of the "Kafala system" Wikipedia page included a "Qatar" subsection that explained: "[m]ost of the workers" in Qatar's workforce "labor under near-feudal conditions that Human Rights Watch has likened to 'forced labor.'"  Wikipedia, "Kafala system" (Apr. 15, 2014) (*available at* https://tinyurl.com/yc2jfsrr).  Qatar was, according to the General Secretary of the International Trade Union Confederation, "'fundamentally'" a "'*slave state[]*.'"  *Id.* (emphasis added).

84.    On information and belief, Defendants' agents and employees reviewed these, and similar, Wikipedia entries relating to the World Cup Construction Venture and the pervasiveness of human trafficking and forced labor by Qatari employers throughout Qatar.  Plaintiffs' belief is based upon the ubiquity of Wikipedia, which rivals essentially only Google as one of the world's most widely used, and relatively accurate, online research tools.  In his book, *How the Internet Happened*, author Brian McCullough explained:

> What confounded everyone who learned of the success of Wikipedia was that it actually worked! … It turned out that the "infinite monkey theorem" about giving enough monkeys typewriters and eventually producing Shakespeare was not exactly fanciful. Enough self-interested strangers could achieve a fair degree of accuracy on a wide range of topics. In 2006, there were 45,000 active editors of the English-language version of Wikipedia alone.

> And Wikipedia had unique advantages that the web made possible. In the coming years, as any news or historical event occurred, Wikipedia contributors would post an up-to-the-minute factual summation of these events, and then amend the entries to reflect changing circumstances or new information. Wikipedia was often accurate and authoritative in near-real time, and it had the infinite space and resources of the Internet to play with, so it could serve what became known as the "long-tail" of content. … No other encyclopedia in history was capable of that sort of breadth of topics.

> Wikipedia was a modern miracle and soon became one of the most trafficked websites in the world … [as] an open-source counterweight to the proprietary "answer engine" that is Google.

### 3. Defendants' Corporate Security and Intelligence Functions

85. Defendants also knew or should have known that they were participating in a trafficking venture because Defendants' internal corporate security and intelligence functions alerted Defendants that their participation in the World Cup Construction Venture benefited from the trafficking and forced labor of persons like Plaintiffs.

86. Defendants' operation of substantial, highly sophisticated, corporate security and intelligence functions[5] ensured that Defendants knew, or should have known, about trafficking by Qatari employers in Qatar, by the Venture, and against Filipinos—migrant laborers like Plaintiffs. Indeed, Jacobs regularly claimed that its purpose-built "intelligence" functions provided state-of-the-art visibility into open source and internal data alike in a manner that gave Defendants, and their clients, like the World Cup Construction Venture, a significant competitive advantage. The

---

[5] For example, Jacobs touts: "If you're in the Intelligence Community or Department of Defense, you can count on Jacobs to provide operations and analysis services for your classified missions, systems and facilities designed to collect, analyze, process and use products of various intelligence sources. In addition to our flight operations support contracts, we also develop and integrate collection and analysis systems and techniques to support strategic and tactical intelligence systems, networks and facilities." Jacobs, *Cyber & Intelligence Solutions*, https://www.jacobs.com/cyber-intelligence-solutions (last accessed Oct. 5, 2023).

same corporate security and intelligence functions from which Defendants derived competitive advantages also alerted them to the trafficking because, in both instances, such functions supplied Defendants with relevant, specific, and potentially actionable data.

### 4. Defendants' Industry-Standard Due Diligence

87. Defendants also knew or should have known that they were participating in a trafficking venture because, on information and belief, Defendants conducted industry-standard due diligence, which alerted Defendants to the risks. On information and belief, such diligence included, but was not limited to: (1) review of the reports described above; (2) preparation and review of due diligence materials (*e.g.*, summaries and emails) prepared by Defendants and/or Defendants' consultants or agents; and (3) discussions with persons who were knowledgeable about prevailing construction practices in Qatar and prevailing labor practices in the Philippines, both of which would be a relevant consideration for any companies, like Defendants, that were considering participating in the World Cup Construction Venture.

88. Plaintiffs' due diligence allegations apply with equal force to CH2M's decision to participate in the Venture, originally, as well as Jacobs's diligence of CH2M before acquiring CH2M. For example, in 2017, Steven Demetriou, Chairman of the Board, CEO, and President of Jacobs Engineering Group Inc. assured its shareholders during an earning call, among other things:

a. "We [*i.e.*, Jacobs] conducted extensive due diligence across CH2M's business, including a deep focus on their project portfolio and their project delivery capabilities and toolsets."

b. Jacobs "ha[d] jointly [] developed" "cost synergy opportunities" "with CH2M leaders during the due diligence" of Jacobs's acquisition of CH2M.

c. "[W]e [*i.e.*, Jacobs] developed a strategy and took a step back and identified where we see where capital is going to be spent globally and where we bring the capabilities to match up on that global capital spend, but we match that up with a separate process to really understand where we're making money, where we're not, by customer, by geography, by office. And

44

therefore, we do believe we now have a much more systematic system that starts with the pursuit process and going after a business that is going to deliver our stated goals of margin improvement, organic growth and create shareholder value.  As we now put that together with CH2M's system, which again, we're very excited about the fact that our due diligence revealed that they have very similar culture and initiatives."

89.    Relatedly, Defendants publicly disclosed that they received counsel from the law firm Gibson, Dunn & Crutcher LLP.  That firm's client alerts alerted Defendants that the World Cup Construction Venture may have used trafficking and forced labor of migrant workers like Plaintiffs.  One such alert from February 2015, entitled, "Webcast: FCPA Trends in the Emerging Markets of Asia, the Middle East, and Africa," included a page entitled "Middle East Case Study: Qatar and the World Cup," which explained "*[i]n addition to the allegations of corruption, Qatar is facing increased scrutiny over allegations concerning the treatment of workers building the stadia to be used*."    (Emphasis added.)    On information and belief, Jacobs reviewed that presentation from its legal counsel before it acquired CH2M and participated in the Venture.

90.    At a minimum, Defendants' industry-standard due diligence supports an inference of Defendants' knowledge of the trafficking and forced labor abuses committed by the World Cup Construction Venture in which they participated.  Given the nature and extent of the public reports described throughout this Complaint it would not have been possible for Defendants to "clear" the trafficking and forced labor risks in the normal course of the due diligence they conducted.

### 5.    Defendants' State-of-the-Art Artificial Intelligence and Big Data

91.    Defendants also knew or should have known that they were participating in a trafficking venture because Defendants' state-of-the-art artificial intelligence, machine learning, and big data expertise alerted Defendants that their participation in the World Cup Construction Venture benefited from the trafficking and forced labor of persons like Plaintiffs.

45

92.     Defendants routinely touted the competitive advantages they derived from Jacobs's cutting-edge artificial intelligence, machine learning, and big data solutions, and specifically observed how such technologies made Jacobs far more aware of its commercial surroundings (and therefore better able to generate profits) than nearly every other company worldwide.  For example, during a Jacobs earnings call in 2019, a Vice President of Jacobs Connected Enterprise, Heather Wishart-Smith, assured shareholders, among other things, that:

> The components of [Jacobs's digital approach] have been around for quite some time. What makes them ***so significant now is the full integration of components like the Internet of Things, artificial intelligence and data analytics***.  What makes them so significant for Jacobs is to have not just the digital capability in order to bring this transformative solution but to have all of the clients that we currently have . . . who have trusted us for decades to now be able to bring the solution in.
>
> The market is poised for explosive growth, and Jacobs is positioned with the technical skills and the clients to capitalize on that growth.  Jacobs is different because we have the combined strength and capabilities of both [engineering, management and consulting lines of business] . . . and have digital capability and domain expertise, which then creates opportunities and value that go far beyond just . . . [what] I've just described with you. …
>
> ***All around the world, [Jacobs's segments] are working together*** to develop and provide new innovative smart city solutions, not just to our traditional clients, but we're attracting new clients along the way.  ***And that is exactly what makes Jacobs a company like no other***.  With our digital capability and our deep domain expertise and with the combined capabilities of [Jacobs's engineering, management, consulting, and digital segments], we are winning more, earning more and creating substantial value for our clients, for our employees and for our investors. (Emphasis added.)

93.     On information and belief, Defendants deployed the same, or substantially similar, artificial intelligence, machine learning, and big data capabilities, functions, personnel, and processes when Defendants participated in the World Cup Construction Venture, which would have made them know that the Venture used trafficked and forced labor.

46

### 6.    Qatar Foundation's Notorious Role, Reputation, and History

94.    Defendants also knew or should have known that they were participating in a trafficking venture because Qatar Foundation's notorious role, reputation, and history also alerted Defendants that their participation in the World Cup Construction Venture benefited from the trafficking and forced labor of persons like Plaintiffs, and ensured that Defendants should have detected, and did detect, abuses and forced labor relating to the Venture.

95.    Qatar Foundation was controlled by the Qatari regime.  It was chaired by Sheikha Moza bint Nasser Al-Missned, the Qatari emir's influential mother, and the CEO was Sheikha Hind bint Hamad Al Thani, the emir's sister.  According to the U.S. State Department's 2022 Country Report, Qatar Foundation housed "[s]everal quasi-governmental organizations" that "rarely criticized" the government.  As such, Qatar Foundation was was widely recognized as a regime mouthpiece whose role is to do the bidding of the regime.  According to public reporting by *The Daily Beast* in 2017, Qatar Foundation was "seen in the emirate as a state-within-the-state," and its "budget is considerable although opaque and remains unpublished."  Further, Hussain Abdul-Hussain and David Adesnik, of the Foundation for Defense of Democracies, reported in 2022 that "Qatar Foundation and the government in Doha cultivate bigotry throughout" Qatar by, *inter alia*, promoting and broadcasting the views of "violent extremists."

47

96.    Defendants knew that due to their participation in the Venture, they were closely intertwined with Qatar Foundation, which openly and notoriously helped play a public leadership role in the Venture.  Indeed, Qatar Foundation touted its role on its website:

> Throughout the 12-year buildup to the FIFA World Cup Qatar 2022™, and the four spectacular weeks of the tournament itself, Qatar Foundation (QF) was at the heart of a nationwide effort to deliver amazing.
>
> As a key supporter of the first FIFA World Cup™ in the Middle East, QF channeled its expertise, its values, its platforms, and its people into the preparations for the tournament, the welcome it would offer to people throughout the world...and the legacy it will create.

97.    Defendants were aware of the World Cup Construction Venture's inextricable linkage to Qatar Foundation due to public reporting.  For example, an article published by *The Daily Beast* in 2017, and entitled **Qatar's Foundation for Hypocrisy**, reported that "[o]ne of the most ambitious stadiums Qatar is building for the controversial 2022 World Cup competition is in the [Qatar Foundation]'s Education City."

98.    Due to Defendants' interaction with and work with Qatar Foundation, Defendants knew Qatar Foundation served as the Qatari regime's notorious "reputation washing" front that

was purpose-built to enable the regime's priorities, including its support for endemic trafficking

of migrant workers, like Plaintiffs, by Qatari employers under Qatar's *kafala* system, which

provided the economic foundation for the Qatari regime's dictatorship.  For example, in 2013, the

*Economist*'s flagship due diligence publication, the *Economist Intelligence Unit*, reported

(headline: ***The Middle East's Migrant Workers: Forget About Rights***) as follows:

> ***Attempts to improve the lot of migrants working in the Middle East are unlikely to make much difference***[.]
>
> ***"Our workers are treated worst in the Gulf," says Walden Bello, a Filipino parliamentarian, referring to those of his countrymen who seek their fortune abroad.*** … Many pay up to $3,000 to recruitment agencies, only to find themselves working long hours for a pittance and with no time off in jobs that often differ vastly from the ones they signed up for back home. Mistreatment, including the sexual sort, is relatively common. ***The International Labour Organisation (ILO), a UN body, reckons that 600,000 workers in the region can be classed as victims of trafficking.***
>
> ***This is the sort of bad press Qatar wants to avoid in the run-up to the 2022 football World Cup, as it imports more workers to build stadiums for the tournament using a labour force already 94% foreign. The Qatar Foundation, an organisation founded by the emir, has drawn up rules for foreign workers.*** …
>
> Sarah Leah Whitson of Human Rights Watch, a New York-based lobby, says the Qatar Foundation code is a model that could spark regional change. ***But she worries that the regulations--which have not been enshrined in Qatari law--will not be put into practice. …*** A Domestic Workers Convention adopted by the ILO in 2011 has found little support in the region. ***Cruelty towards foreign workers … remains widespread.***
>
> ***The migrant workers' lot is unlikely to improve until the reform of the kafala system, whereby workers are beholden to the employers who sponsored their visas.*** The system blocks domestic competition for overseas workers in the Gulf countries. …
>
> ***Rulers of the Gulf states, where workforces are made up of low-paid foreigners, are loth to change the system, since it ensures cheap labour.*** Eyeing unrest elsewhere in the region, they are wary of upsetting locals. ***The migrants' suffering is not about to end.***  (Emphases added.)

99.     From 2013 until at least 2020, Qatar confirmed Ms. Whitson's, and Human Rights Watch's, skepticism in the above quote:  The Qatari regime made no meaningful changes to Qatar's *kafala* system and, consequently, Qatar Foundation's role was merely to reputation wash for the World Cup Construction Venture.  Similarly, in accordance with Defendants' pervasive corporate policy and general theme and subservience to the Supreme Committee and the Qatari regime, *supra* ¶ 23 ("the client is king" to whom you must bow down), Defendants kowtowed to the Qatari regime and assisted it as it refused to reform, slowed reform, did not implement reforms, and obfuscated regarding the need for reform or failures to do so.  The labor abuses detailed in this Complaint continued in part due to Defendants' subservience to their client, even after any purported "reforms."

100.     In 2014, the *Guardian*, published a lengthy investigative report headlined ***Modern-Day Slavery – Qatar World Cup: Migrants Wait a Year to Be Paid for Building Offices***, *supra* ¶ 71(b), and stated in relevant part:

> Migrant workers who built luxury offices used by Qatar's 2022 football World Cup organisers have told the Guardian they ***have not been paid for more than a year and are now working illegally from cockroach-infested lodgings***. . . .
>
> The project, a Guardian investigation shows, was directly commissioned by the Qatar government and the workers' plight is ***set to raise fresh doubts over the autocratic emirate's commitment to labour rights as construction starts this year on five new stadiums for the World Cup.***
>
> ***The offices, which cost £2.5m to fit, feature expensive etched glass, handmade Italian furniture, and even a heated executive toilet, project sources said. Yet some of the workers have not been paid, despite complaining to the Qatari authorities months ago and being owed wages as modest as £6 a day.***
>
> ***By the end of this year, several hundred thousand extra migrant workers from some of the world's poorest countries are scheduled to have travelled to Qatar to build World Cup facilities and infrastructure. The acceleration in the building***

*programme comes amid international concern over a rising death toll among migrant workers and the use of forced labour. . . .*

The migrants are squeezed seven to a room, sleeping on thin, dirty mattresses on the floor and on bunk beds, in breach of Qatar's own labour standards. They live in constant fear of imprisonment because they have been left without paperwork after the contractor on the project, Lee Trading and Contracting, collapsed. They say they are now being exploited on wages as low as 50p an hour. . . .

Qatar's World Cup organising committee confirmed that it had been granted use of temporary offices on the floors fitted out by the unpaid workers. …

*Jim Murphy, the shadow international development secretary, said the revelation added to the pressure on the World Cup organising committee after . "They work out of this building, but so far they can't even deliver justice for the men who toiled at their own HQ," he said.*

*Sharan Burrow, secretary general of the International Trade Union Confederation, said the workers' treatment was criminal. "It is an appalling abuse of fundamental rights, yet there is no concern from the Qatar government unless they are found out," she said. "In any other country you could prosecute this behaviour." . . .*

Contracts show the project was commissioned by Katara Projects, a Qatar government organisation under the auspices of the office of the then heir apparent, Sheikh Tamim bin Hamad al-Thani, who is now the emir. He also heads the supreme committee, the World Cup organising body. The committee is spending at least £4bn building new stadiums for the tournament, which has become mired in allegations of bribery, while there is disbelief at the prospect of playing the tournament in Qatar's 50C [*i.e.*, 122 degrees Fahrenheit] summer heat. …

*The problems at the Tower of Football workers are not isolated, despite Qatar's pledges to monitor salary payments and abolish the kafala sponsorship system, which stops migrant workers changing job or leaving Qatar without their employer's consent. In 2012 and 2013, 70 labourers from India, Nepal and Sri Lanka died from falls or strikes by objects, 144 died in traffic accidents and 56 killed themselves, the government's own figures show. Dozens more young migrant workers die mysteriously in their sleep from suspected heart attacks every summer.*

The *Guardian* discovered *more projects where salaries had not been paid*. They included a desert camp of 65 workers who had not been paid for several months, were sleeping eight to a room, and were living with dirty drinking water, filthy, unplumbed toilets and no showers.

51

Another group said they were being paid only sporadically, that there was sometimes no water in their housing and no electricity to power air conditioning.

***This month, the Qatar Foundation, a state body, published a report examining trafficking, debt bondage and forced labour among migrant workers.  It identified practices that contravene International Labour Organisation conventions on forced labour and UN anti-trafficking protocols, "widespread" non-payment of wages and bribery and extortion among recruitment agents and employers. . . .***

"We know there is much more to do," said Abdullah al-Khulaifi, Qatar's minister of labour and social affairs in a statement detailing progress on labour law reforms. "But we are making definite progress and are determined to build momentum."

101.    Abdullah al-Khulaifi's statement above was a lie, the cover for which was provided by Qatar Foundation.  Qatari regime officials made similar statements every year between 2013 and 2020, typically in contexts in which Qatar Foundation was also referenced, like here.  And, of course, that was the point all along:  A front (which provides "cover") only works if one claims to oppose the thing that they are engaging in, *i.e.*, one lies.  Otherwise, it would not provide "cover" to the regime's sponsorship of trafficking and forced labor under Qatar's *kafala* system in the first instance.  Similarly, the fact that Qatar Foundation regularly published reports confirming that trafficking was widespread was a feature, not a bug, of Qatar Foundation's role as a front.[6]  Given Defendants' sophistication, including their employment of security and intelligence professionals, Defendants understood that the practices described in articles like those published by the *Guardian*

---

[6] Given that the its purpose was to simply persuade gullible audiences that the Qatari regime was trying to improve conditions for laborers (when it was not), Qatar Foundation had no choice but to regularly issue reports observing the obvious—that trafficking was endemic in Qatar—so that Qatar Foundation could then say that it was credible and people could trust it when it claimed to be fighting trafficking.  In this way, Qatar Foundation was like a corrupt political leader who claimed to be cracking down on bribery when, in reality, he was simply leveling corruption charges against his competitors in the bribery marketplace so his own economic needs would be satisfied.

could not be reconciled with Qatar Foundation's declarations unless one concluded that the latter was, in fact, a front rather than an organization dedicated to combatting trafficking.

102.    The same 2014 *Guardian* report also contained a link to a 14-minute short film documentary by the *Guardian*'s journalists,[7] which supported the conclusion that thousands of migrant laborers who worked on the World Cup Construction Venture likely died as a result of their work on the Venture because the Venture's migrant laborers from India and Nepal alone accounted for 882 reported deaths during the Venture during the 2012–2013 period alone.  On information and belief, the Venture's participants pervasively underreported the numbers of deaths, substantial injuries, and physical, including sexual, assaults that were committed against migrant laborers trafficked by and for the Venture and its participants.

103.    The same *Guardian* documentary video report provided substantial video and photographic evidence of the pervasive trafficking and labor abuses perpetrated against migrant laborers who worked on the World Cup Construction Venture, like Plaintiffs.  *See supra* ¶ 76 (images of labor abuses captured from *Guardian* Qatar World Cup Video).  Summing up the inhumane and unlawful working and living conditions under which migrant laborers, like Plaintiffs, were trafficked by the Venture and its participants, the *Guardian* concluded that the Qatari regime, the Venture, and Venture participants had treated, and continued to treat, migrant laborers working on the Venture as "***just another disposable commodity***."  (Emphasis added.) This comports with reporting regarding an Amnesty International investigation which concluded "World Cup workers [were] 'treated like cattle.'"

---

[7] *See* Qatar World Cup Video, *available at* https://tinyurl.com/y9hcmc8k.

104.    In 2014, Human Rights Watch publicly called out Qatar Foundation for serving, in effect, as a fig leaf for the Qatari regime's (and Qatari employers') ongoing refusal to do anything meaningful that would prevent laborers, like Plaintiffs, from being trafficked in connection with the World Cup Construction Venture:

> The Qatar Supreme Committee, the body charged with delivering the Gulf state's 2022 World Cup, this morning released its Workers' Welfare Standards.  In this detailed 50-page document, the committee outlines how it intends to ensure the basic rights of foreign migrant workers involved in select projects related to the construction of stadiums and associated infrastructure. *(Another quasi-governmental body, the Qatar Foundation, released a similar set of standards in April 2013.)*
>
> These … efforts … do not go nearly far enough in a country with such a dismal record on workers' rights. …
>
> *[I]t would be credulous to regard this as a long-term solution to very serious problems in Qatar and the rest of the Gulf.  The new standards don't ensure a worker's rights to change employers, leave the country, or bargain collectively for better pay and conditions.*  And the standards will impact only a small fraction of migrant workers in Qatar, excluding even some of those serving the World Cup, such as the construction workers building the hotels where fans will stay, or the taxi drivers who will shuttle tourists around the capital, Doha. *The standards don't alter the fact that, more than three years after Qatar won the bid to host the 2022 World Cup, Qatar's legal and regulatory framework still facilitates the trafficking and forced labor of migrant workers.*
>
> *Qatar's labor system needs a major overhaul, not a minor makeover.  Reform should be led by the relevant government authorities, not the World Cup delivery committee*, and it should address all migrant workers in the country, not just those who will build futuristic stadiums.

105.    Defendants also knew, or should have known, of a litany of contemporaneous reports that alleged that Qatar Foundation, and its associated charities, had directly funded HAMAS, Hezbollah, al-Qaeda, and other notorious trafficking ventures (and terrorist groups), which were known for engaging in significant and systematic human trafficking, including when

54

Defendants worked closely with Qatar Foundation, which alerted Defendants that Qatar Foundation was not a legitimate charity, but instead a front that enabled human trafficking.

106.    For example, the *Australian Review* publicly reported in 2012 that "Qatar Foundation" had "attracted [] negative headlines due to allegations that the non-profit organisation had provided funding to terrorists." Similarly, in 2015, Shurat HaDin Israeli Law Center, an Israeli NGO dedicated to fighting extremism in the Middle East, launched a media campaign, including a detailed press release, that publicly "called on FC Barcelona to suspend ties with the Qatar Foundation on the grounds that it [was] 'immoral to receive funding from a country that supports terrorist groups,'" during which Nitsana Darshan-Leitner, the NGO's president, warned anyone adjacent to Qatar Foundation, like Defendants, that "[w]e know that Qatar [through Qatar Foundation] has … funded … groups like Islamic State, Al-Qaeda and Hamas." And in 2017, Israeli attorney Louis Garb publicly observed that "Qatar" was "a vicious, terror-supporting dictatorship" such that "Qatar, through Hamas and Hezbollah, support[ed] terror worldwide" and "also use[d] slave labor to build the stadiums needed to indulge the megalomania of its rulers who, through bribery, won the opportunity to host the next World Cup."

107.    Defendants knew that HAMAS was a notorious trafficker, which further contextualized their awareness of the role of Qatar Foundation. In 2007, for example, *Deutsche Presse Agentur* (*i.e.*, the German Press Agency), publicly reported that Dutch researchers had concluded that "the militant Palestinian Hamas movement" financed itself, in substantial part, through the "[l]arge sums of money" HAMAS received "from the money [that] originate[d] from … human trafficking." Similarly, in 2014—while Qatar Foundation was ramping up its support for HAMAS—numerous sources in Israeli media confirmed HAMAS's bedrock reliance on

trafficking, like when *Israel National News* reported that, "Palestinian Authority … Chairman

Mahmoud Abbas's Fatah … exposed that Hamas is running a human trafficking network."[8]

108.    Defendants knew that Hezbollah was a notorious trafficker, which further

contextualized their awareness of the role of Qatar Foundation.    In 2017, for example,

Representative Ann Wagner and Dr. David Asher, of the Foundation for Defense of Democracies,

had the following exchange regarding Hezbollah's human trafficking:

> WAGNER: Dr. Asher … We also know that Hezbollah generates revenue from … human trafficking in the Americas.    Can you please discuss ***Hezbollah's involvement in human trafficking in Lebanon, Syria, globally***?
>
> ASHER: … I'm aware of one of the top tier targets, we call them super facilitators. We actually had a thing called Iran-Hezbollah Super Facilitators Initiative targeting key functional financiers for the Hezbollah-Iran network globally. And I'm aware of one very significant case of Syrian children being trafficked all the way into West Africa by this [Hezbollah] individual.  And it was a very painful case for us because the U.S. government was well aware of it and we did nothing. And it still haunts me that these poor children, and they were like young girls and boys were sent to a heinous country in West Country probably to their death ***because the guy in charge seemed to like torturing children***.  So, that is one case.  He was definitely a Hezbollah senior functional official … (Emphasis added.)

109.    Defendants knew that al-Qaeda and ISIS—which were part of the same

organization until 2014, and followed the same general approach with respect to trafficking—were

notorious traffickers, which further contextualized their awareness of the role of Qatar Foundation.

---

[8] More generally, Defendants' knowledge that Qatar Foundation was in the business of directly supporting groups that committed systematic violence like trafficking humans, beheading hostages, and detonating car bombs, also alerted Defendants that Qatar Foundation was ***not a legitimate charity***.    When Defendants collaborated with Qatar Foundation, they were not partnering with a legitimate charitable institution—they were partnering with a notorious front that the Qatari regime used to funnel money to its violent, human trafficker allies like HAMAS, Hezbollah, al-Qaeda, and ISIS, among the many notorious hostage-taking trafficking ventures/terrorist groups with which the regime was aligned.

Indeed, slavery was literally written into ISIS's founding charter.  Per a *CNN* headline in 2014:

"***ISIS: Enslaving, Having Sex With 'Unbelieving' Women, Girls Is OK***."

110.    Defendants' knowledge that Qatar Foundation was directly involved in aiding notorious trafficking ventures (and terrorist groups) like HAMAS, Hezbollah, al-Qaeda, and ISIS confirms that Defendants knew, or should have known, that Qatar Foundation supported human trafficking in Qatar.  These groups that Qatar Foundation supported were notoriously engaged in human trafficking and forced labor, including, but not limited to, by engaging in hostage-taking and ransoms, forced labor and services, and sex trafficking.

111.    Due to all these red flags about Qatar Foundation, Defendants knew that Qatar Foundation was, and is, best understood as a reputation washing front designed to enable trafficking, including in relation to the World Cup Construction Venture, rather than serving as a legitimate charitable foundation.  Defendants knew of Qatar Foundation's true nature for at least three reasons.  *First*, media reports, including but not limited to the *Economist*'s reporting, alerted Defendants to this reality.  *Second*, the contexts in which Defendants operated made such conclusion obvious, *e.g.*, the ineluctable conclusion that Qatar Foundation's anti-trafficking words were lip service designed to provide cover for continued trafficking given the Qatari regime's absolute power and control over the country and Qatar Foundation.  *Third*, Defendants' corporate security and intelligence personnel also knew such facts to be true because such understanding of Qatar Foundation was widespread throughout the Middle East, and was of the nature that Defendants' monitoring processes would have gathered sufficient data to alert them to Qatar Foundation's true nature.

57

112.    For all these reasons, Defendants' work with Qatar Foundation made them know, or they should have known, that the World Cup Construction Venture engaged in human trafficking and forced labor.

### 7.   Defendants' Venture-Related Policies and Procedures

113.    Jacobs's and CH2M's compliance with their stated policies and procedures also alerted Defendants to the anti-trafficking risks, and should have detected, and did detect, labor abuses and forced labor, relating to the World Cup Construction Venture in which they participated.  Jacobs represents that its employees "do things right," "always act with integrity," "tak[e] responsibility for our work," and "stay[] focused on safety."  To that end, Jacobs says it has "taken a variety of actions to verify the absence of modern slavery in [its] supply chain."  As described below, Defendants' policies and procedures alerted Defendants to the anti-trafficking risks they faced:

a.   Supplier Code of Conduct.  Jacobs has a "Supplier Code of Conduct," through which Jacobs claims that it demands its suppliers, and Jacobs's suppliers' suppliers, to "[c]omply with applicable laws concerning . . . forced labor, human trafficking, working hours, . . . [and] fair wages."  Pursuant to the Supplier Code of Conduct, Jacobs claims that it "*regularly conduct[s] audits and thoroughly investigates possible non-compliance*" therewith.  Jacobs also uses a "human rights prequalification questionnaire" to screen suppliers. (Emphasis added.)

b.   Internal Reporting.  Jacobs says that it encourages its "employees, suppliers and stakeholders to speak up, without retribution, about any concerns regarding human rights and modern slavery in [its] operations or supply chain" and pledges to "investigat[e] reports in an appropriately robust and timely manner."  Jacobs employees in Colorado, on information and belief, performed work related to auditing and investigating forced labor and human trafficking issues related to the World Cup Construction Venture.

c.   Supply Chain Mapping and Risk Assessments.  Jacobs represents that it "*conduct[s] due diligence* to avoid complicity in human rights abuses."  For example, Jacobs "periodically conduct[s] global supply chain mapping and human rights risk assessment, . . . sometimes with the support of third-party consultants," and identifies "highest risk areas for human rights and *modern slavery exposure, with a particular emphasis on geography, service type and operational context*." (Emphasis added.)  Jacobs employees in Colorado, on information and

belief, performed work related to labor supply-chain mapping and human rights risk assessment related to the World Cup Construction Venture.

d. <u>Post-Execution Due Diligence</u>.  Jacobs also knew of the abuses because it purportedly "conduct[s] ongoing due diligence of suppliers based on international indices, *media searches* and other indicators of supplier risk."  (Emphasis added.)  Jacobs employees in Colorado, on information and belief, performed work related to due diligence related to forced labor and human trafficking issues related to the World Cup Construction Venture.

e. <u>Post-Execution Audits</u>.  Jacobs recently stated that it "*conducted worker accommodation and employment practices audits* of suppliers employing foreign migrant workers in a high-risk geography," "identif[ied] areas for improvement," and "*engaged with suppliers to implement corrective actions*."  (Emphasis added.)

Via each of these acts, Jacobs knew or should have known that there was trafficked and forced labor throughout the World Cup Construction Venture.

114.    Before beginning work on the World Cup Construction Venture, CH2M disclosed in its 2011 Sustainability Report that it similarly, as a matter of policy and procedure, takes actions that alerted it (or should have alerted it) that there was trafficked and forced labor in the Venture. CH2M stated in relevant part that it:

> *monitors engagement* of suppliers, contractors, and labor brokers *who are from or use labor from countries identified by the United Nations and the U.S. State Department as high risk for human rights abuses, including, but not limited to, the use of forced or child labor*.  *We have identified the Middle East*, central and southwest Asia, and certain countries in Central Europe as *areas with higher risk of human rights and trafficking in labor violations*.  Therefore, we have developed *special protocols to screen our labor brokers and vet our contractors and suppliers* to reduce our risks of inadvertently enabling human rights violations or child or *forced labor situations*.  (Emphasis added.)

115.    For these reasons, Defendants knew or should have known, due to their own execution of their purported policies and procedures, that the Venture relied upon trafficked and forced labor.

**8.   Defendants' Roles in the World Cup Construction Venture**

116.   Defendants' specific roles in the World Cup Construction Venture also alerted Defendants to the anti-trafficking risks, and ensured that Defendants should have detected, and did detect, labor abuses and forced labor, relating to the Venture in which they participated. Defendants, as managers and overseers of the entire World Cup Construction Venture, had the right to assign tasks to other venture participants in the World Cup Construction Venture, and were able to control the means and details by which the other Venture participants in the World Cup Construction Venture performed their work in furtherance of the Venture.   Defendants' management, oversight, and ability to control how other venture participants worked on the World Cup Construction Venture included the ability to prevent Defendants' venture partners (including Plaintiffs' employers) from exploiting forced or trafficked labor.

117.   For example, in 2013, a spokesperson for CH2M asserted where CH2M, in its role as manager and overseer of the development of the stadiums in the World Cup Construction Venture, had "control, we take the strongest possible action to protect migrant labor," and where they were in a supervisory role, when there are "safety issues," "we take action, working with our clients to investigate and respond in an appropriate manner."

118.   That same spokesperson publicly stated that CH2M "ensure[s] that appropriate terms and conditions are properly placed in the procurement documents of our clients.  In cases where we have a supervisory role over a contractor, we apply our health and safety guidelines."

119.   Jacqueline Hinman, then CEO of CH2M, publicly confirmed in November 2016 that due to the "serious concerns about worker welfare," CH2M actively

> worked with clients Qatar 2022 [World Cup] . . . to improve standards for employment, safety, and worker accommodations. . . . *we strengthened supply-*

> *chain qualification requirements for procurement and contractor selection with an inspection regime for enforcement*. . . . We see this as a valuable program-management tool to empower workers and *ensure these welfare standards are being met*.

120.    CH2M, and then Jacobs after it acquired CH2M, purportedly took actions to ensure labor welfare, per its contractual duty and its representations that it was doing so, and thereby knew or should have known of Plaintiffs' inhumane and exploited conditions imposed by Plaintiffs' employers, who were World Cup Construction Venture participants with Defendants.  CH2M, and then Jacobs after it acquired CH2M, thereby knew or should have known of and could have prevented or influenced Plaintiffs' inhumane and exploited conditions.

121.    CH2M, and then Jacobs after it acquired CH2M, claimed to ensure proper terms and conditions, and health and safety guidelines were in place and followed by the other Venture participants in the World Cup Construction Venture, including but not limited to Plaintiffs' employers, per its contractual duty and its representations that it was doing so, and thereby knew or should have known of Plaintiffs' inhumane and exploited conditions imposed by Plaintiffs' employers, who were World Cup Construction Venture participants with Defendants.  CH2M, and then Jacobs after it acquired CH2M, thereby knew or should have known of and could have prevented or influenced Plaintiffs' inhumane and exploited conditions.

122.    A CH2M spokesperson also touted that CH2M, in its role as overseer and manager of the World Cup Construction Venture, would "lead by example" to "significantly improve the treatment of workers" by setting "standards" for things such as ethical recruitment, employment standards, and health and safety, "establishing an inspection and enforcement regimen" including "audits at multiple levels within the organization and periodic workers inspections," and managing

"contractor selection" to "establish a procurement approach that verifies contractor worker welfare."

123.    CH2M, and then Jacobs after it acquired CH2M, took on the role of inspecting Plaintiffs' worksites and living conditions, per its contractual duty and its representations that it was doing so, and thereby knew or should have known of Plaintiffs' inhumane and exploited conditions imposed by Plaintiffs' employers, who were World Cup Construction Venture participants with Defendants.  CH2M, and then Jacobs after it acquired CH2M, thereby knew or should have known of and could have prevented or influenced Plaintiffs' inhumane and exploited conditions.

124.    CH2M, and then Jacobs after it acquired CH2M, was responsible for setting standards for ethical recruitment, employment standards, and workers' health and safety, per its contractual duty and its representations that it was doing so, and thereby knew or should have known of Plaintiffs' inhumane and exploited conditions imposed by Plaintiffs' employers, who were World Cup Construction Venture participants with Defendants.  CH2M, and then Jacobs after it acquired CH2M, thereby knew or should have known of and could have prevented or influenced Plaintiffs' inhumane and exploited conditions.

125.    CH2M, and then Jacobs after it acquired CH2M, audited at multiple levels within the organization and conducted periodic inspections of work and living sites, per its contractual duty and its representations that it was doing so, and thereby knew or should have known of Plaintiffs' inhumane and exploited conditions imposed by Plaintiffs' employers, who were World Cup Construction Venture participants with Defendants.  CH2M, and then Jacobs after it acquired

CH2M, thereby knew or should have known of and could have prevented or influenced Plaintiffs' inhumane and exploited conditions.

126. During the entirety of the World Cup Construction Venture, CH2M (and then Jacobs after it acquired CH2M) had policies of evaluating subcontractors' worker welfare policies, which required it to regularly visit worksites. As such, CH2M (and then Jacobs after it acquired CH2M) had a practice of "screen[ing] before engaging a supplier, and monitor[ing] during the work phase." As part of this practice, CH2M (and then Jacobs after it acquired CH2M) engaged with the entities who directly employed construction laborers. Given their policies and screening practices, Defendants knew or should have known of Plaintiffs' inhumane and exploited conditions imposed by Plaintiffs' employers, who were World Cup Construction Venture participants with Defendants. CH2M, and then Jacobs after it acquired CH2M, thereby knew or should have known of and could have prevented or influenced Plaintiffs' inhumane and exploited conditions.

127. CH2M, and then Jacobs after it acquired CH2M, managed contractor selection to establish a procurement approach that verified contractor worker welfare, per its contractual duty and its representations that it was doing so, and thereby knew or should have known of Plaintiffs' inhumane and exploited conditions imposed by Plaintiffs' employers, who were World Cup Construction Venture participants with Defendants. CH2M, and then Jacobs after it acquired CH2M, thereby knew or should have known of and could have prevented or influenced Plaintiffs' inhumane and exploited conditions.

128. CH2M, and then Jacobs after it acquired CH2M, with the role as overseer and manager of the entire World Cup Construction Venture, was responsible for "ensur[ing] that appropriate terms and conditions [were] properly placed in the procurement documents" of the

63

Venture participants and used "strategic procurement and performance monitoring as additional means to address labor standards issues."  As such, CH2M, and then Jacobs after it acquired CH2M, had direct control over the terms and conditions of workers' employment and thereby knew or should have known of Plaintiffs' inhumane and exploited conditions imposed by Plaintiffs' employers, who were World Cup Construction Venture participants with Defendants. CH2M, and then Jacobs after it acquired CH2M, thereby knew or should have known of and could have prevented or influenced Plaintiffs' inhumane and exploited conditions.

129.    For all these reasons, as overseer and manager of the World Cup Construction Venture, CH2M and Jacobs were frequently involved in the day-to-day aspects of each stadium construction project.

130.    By way of example, Jacobs employee Mr. Shaw's LinkedIn page details that he worked with another health and safety professional from Jacobs, Sajith Sathyan, to improve safety conditions at a particular worksite.  Additionally, another CH2M worker, Ali Marcotte, served as a Program Management Consultant and Performance Manager for the World Cup Construction Venture, and publicly listed her responsibilities as including "conceiv[ing] and implement[ing] a performance management system for contractual execution across the [Venture] supply chain," which entailed, among other things, "schedule, budget, sustainability, [health and safety] and worker welfare through contractual terms and conditions for all [] suppliers," and "performance monitoring requirements."  Another former Jacobs employee publicly touted the work they did for Jacobs on the Al Thumama Stadium, in direct interaction with Al Jaber Engineering, in a role that required weekly site visits and safety tours, with the responsibility of ensuring contract compliance and that health and safety standards were obeyed and implemented.  By virtue of this evident direct

participation in the Venture, *see generally supra* V.B, Defendants knew or should have known that the World Cup Construction Venture was engaging, throughout, including but not limited to by Plaintiffs' direct employers, in human trafficking and forced labor.

131.    Because Defendants were managing performance of the other participants in the World Cup Construction Venture, Defendants by virtue of their participation in the Venture knew or should have known of Plaintiffs' inhumane and exploited conditions imposed by Plaintiffs' employers, who were World Cup Construction Venture participants with Defendants.

132.    Because Defendants were exerting management across the entire World Cup Construction Venture supply chain to purportedly ensure worker welfare, Defendants knew or should have known of Plaintiffs' inhumane and exploited conditions imposed by Plaintiffs' employers, who were World Cup Construction Venture participants with Defendants.

133.    Because Defendants had control over contractual terms and conditions for all suppliers in the World Cup Construction Venture, Defendants knew or should have known of Plaintiffs' inhumane and exploited conditions imposed by Plaintiffs' employers, who were World Cup Construction Venture participants with Defendants.

134.    Due to their role as overseeing and managing the World Cup Construction Venture, Defendants were positioned to learn, and in fact did learn once the Venture was formed, about the Venture's use of forced and trafficked labor and, with full knowledge of the forced and trafficked labor, chose to financially benefit by continuing to do business with the partners in the Venture (including but not limited to Plaintiffs' direct employers) and participate in the Venture.

135.    Due to their role as overseeing and managing the World Cup Construction Venture, Defendants were positioned to learn, and in fact did learn once the Venture was formed, about the

Venture's exploitation of Plaintiffs by confiscating workers' passports upon their arrival and refusing to return the passports until conclusion of the worker's contractual term, as a way to

a. control and limit Plaintiffs' movements while in Qatar, to preclude a search for new employment, and to preclude Plaintiffs' return to the Philippines;

b. ensure they were forced to endure unsafe, unsanitary, and exploitative living conditions, including but not limited to the provision of unsanitary or insufficient food and forced living in crowded conditions;

c. ensure Plaintiffs were forced to endure unsafe and exploitative working conditions, such as forced work for extremely long hours, working in inhumane conditions such as without sufficient water; and

d. not providing fair or promised compensation, including for overtime.

Fully knowing these facts, Defendants chose to continue to do business with the partners in the Venture (including but not limited to Plaintiffs' direct employers) and financially benefit by participating in the World Cup Construction Venture.

136. Due to their role as overseeing and managing the World Cup Construction Venture, Defendants were positioned to learn, and in fact did learn once the Venture was formed, about the Venture's exploitation of Plaintiffs, including lies told to Plaintiffs regarding working and living conditions, and pay, to induce them to agree to travel to Qatar and work for Venture. Fully knowing these facts, Defendants chose to financially benefit by continuing to do business with the partners in the Venture (including but not limited to Plaintiffs' direct employers)and participate in the World Cup Construction Venture.

137. Without discovery the terms of the contracts between and among the different joint venture partners for the World Cup Construction Venture are not knowable, but publicly available information indicates CH2M (and then Jacobs once it acquired CH2M) had direct control or the right to control each joint venturer's conduct vis-à-vis the construction workers, including but not

limited to Plaintiffs' direct employers, and exerted that control through auditing, oversight, inspections, and mandated policies and procedures.

### 9.    Defendants' Venture-Related Course of Dealings

138.    Defendants' course of dealings—including those of their partners, *e.g.*, the Supreme Committee and FIFA—also alerted Defendants that they were participating in a trafficking and forced labor venture and provides further direct evidence that Defendants knew of these abuses in the World Cup Construction Venture in which they participated.  Plaintiffs are aware of at least four instances when such course of dealings confirms that Defendants knew or should have known that Plaintiffs were being trafficked by the World Cup Construction Venture in which Defendants participated.  The examples below are not exhaustive; they reflect what Plaintiffs have been able to piece together without discovery.  The full details of Defendants' course of dealings (and knowledge gained by the course of dealings of the other participants in the Venture, with whom Defendants communicated) rest within Defendants' sole control.  Discovery will likely uncover many other similar instances when such course of dealings demonstrate that Defendants knew or should have known of the trafficking and forced labor throughout the Venture.

139.    *First*, CH2M knew of *kafala* and the terrible conditions of the working environment in Qatar.  in 2013, CH2M's Assurance Director admitted that CH2M knew that working conditions were unsafe.  He was quoted to say that "***his team has estimated that at least 14 people will die while building Qatar's World Cup stadiums***," and "***[t]here are quite a few unsafe construction sites . . . I am half expecting bodies to land next to me every time I go past.***" (Emphasis added.)  Although that admission was controversial at the time, in fact, CH2M dramatically underestimated the number of World Cup 2022 construction worker deaths, and some estimates put the number of

such workers' deaths in the thousands.  Defendants thus knew or should have known that the World Cup Construction Venture mistreated migrant workers in the ways discussed *supra* ¶¶ 48–50.

140.    *Second*, in 2013, FIFA acknowledged that "fair working conditions [for migrant workers] with a lasting effect must be introduced quickly in Qatar."  However, the Qatari regime would not begin implementing those "reforms" until 2020; even after, ongoing labor practices continued to violate the TVPRA.

141.    *Third*, in 2015, VINCI, a construction company working on the Al Rayyan Stadium and Precinct project for the World Cup, and thus a part of the World Cup Construction Venture Defendants participated in, admitted to confiscating passports after a related public accusation.

142.    *Fourth*, in 2015, CH2M, via CH2M HILL International B.V., entered into a memorandum of understanding with the State of Qatar (*i.e.*, the Qatari regime), the Supreme Committee, and Qatar Foundation, to access and provide technology assistance called "Better Connections" in the "residential compounds" of the migrant workers.  One public report noted:

> ***The programme is expected to cover expatriate workers from*** India, ***The Philippines***, Nepal, Sri Lanka, Pakistan, Bangladesh, Ethiopia, Thailand, Vietnam and Ghana. ictQATAR also inked MoUs with the Supreme Committee for Delivery & Legacy (SC), Qatar Foundation (QF) and CH2M HILL International BV (CH2M) which work on the most iconic infrastructure projects in the country. (Emphasis added.)

Via this program, CH2M had access to and thus witnessed the inhumane living conditions the trafficked and forced laborers endured.  CH2M, as a whole, and via CH2M Hill Companies, Ltd. in its 2016 Sustainability and Corporate Citizenship Report, took responsibility for and credit for the "Better Connections" program in Qatar, showing how CH2M as a whole was involved:

> We won the award ***with our partner***, Qatar's Ministry of Information and Communications Technology (ictQatar), in recognition for ***our leadership on ictQatar's Better Connections Program***. . . . the program provides Internet access

and technology training to low-income migrant construction workers, so they may stay in touch with their families and loved ones back home.  The Better Connections Program *has set up and equipped 100 new ictQatar facilities at worker accommodations, reaching thousands of migrant workers across Qatar*.  *Other Better Connections partners include the Supreme Committee for Delivery & Legacy (our 2022 FIFA World Cup Qatar client)*, Qatar's National Human Rights Committee, Qatar Foundation, and Microsoft Qatar.  (Emphasis added.)

**D.      Defendants Knowingly Benefitted from Participation in the World Cup Construction Venture.**

143.    Defendants entered into a contract to oversee and manage the World Cup Construction Venture.  The value and total scope of the World Cup contract to Defendants is not known at this time.  On information and belief, Defendants realized, at least, more than $50 million dollars in profit from their participation in the Venture, because it is not plausible that Defendants received less than $5 million per year in net profit given the scale of the Venture.  Discovery is likely to reveal Defendants earned far more, likely hundreds of millions of dollars more.

144.    Each Defendant knowingly benefitted from the World Cup Construction Venture in Colorado.  For example, the Supreme Committee paid  money to CH2M, and then Jacobs after it acquired CH2M, for Defendants' work as participants in the World Cup Construction Venture, and those funds flowed to CH2M's and Jacobs's offices in Colorado.  Money paid to Jacobs also flowed to its offices in Texas.

145.    Each of Defendants' and Defendants' employees' public announcements regarding the World Cup Construction Venture confirm not only that they participated in the Venture (and each social media post is, in and of itself, participation in the Venture, at times from within this District), but also that Defendants knowingly received benefits in the United States in the form of the publicity and notoriety of being involved in such a high-profile international project.  Examples of this participation and knowing benefit include:

a.  Jacobs's main corporate Facebook page, titled Jacobs Solutions Inc., adopted and incorporated posts from CH2M's prior Facebook page, including a February 9, 2012 post, with a picture of CH2M's then-CEO Jacqueline Hinman signing the contract to participate in the World Cup Construction Venture.  Jacobs Solutions Inc. participated in the Venture by posting this:



70

b. Jacobs's corporate Twitter account appears to have adopted posts from CH2M's prior Twitter account, including a post from February 9, 2012:



c. At the time of the opening ceremony for the World Cup, Jacobs's main corporate accounts on both Facebook and LinkedIn took responsibility for working on the World Cup Construction Venture for the entire decade during which Plaintiffs were harmed as alleged herein.

d. Jacobs's Program Director for Sports and Entertainment, Joseph Danko, was based in the U.S. and publicly touted while in the United States that he was proud to have worked on the World Cup Construction Venture, including on its "worker welfare standards." In April 2022, Mr. Danko also publicly stated via LinkedIn "I am honored to be part of the 'One Team' created with the Supreme Committee for Delivery & Legacy."

e. Rehan Khan, Jacobs's Qatar Country Director and Executive Program Manager for the World Cup, posted on LinkedIn in April 2022, after a Qatar visit from Jacobs executives including U.S.-based Joseph Danko and Patrick Hill, that "[i]t was a great success having ***Jacobs employees meet with their leadership***." Mr. Danko, who worked on the World Cup Construction Venture, both before and after Jacobs acquired CH2M, and from the United States, responded to Mr. Khan's post by saying "[m]y appreciation goes out to the exemplary leadership of the Supreme Committee . . . Having been fortunate enough to be there from the very beginning this moment was amazing for me."

f. In late 2022 or early 2023, Mr. Danko publicly commented on Ali Marcotte's LinkedIn post that Ms. Marcotte, who was formerly a CH2M employee managing performance standards and contract compliance throughout the World Cup Construction Venture supply chain, was "such a strong contributor to ***our 'One Team' with the [Supreme Committee] to make this possible***."

146. Each Defendant also benefitted from Plaintiffs' trafficked and forced labor. Trafficking Plaintiffs and Plaintiffs' forced labor allowed all participants in the World Cup Construction Venture, including Defendants, to benefit from an inadequately compensated, captive workforce, working excessive hours, with inadequate allowances for food and cheap, substandard, overcrowded, and unsanitary housing. Plaintiffs' forced labor allowed Defendants

and their Venture partners to complete World Cup construction projects more quickly and cheaply than would have been possible without Plaintiffs' forced labor.  Defendants benefited thereby.

**E.      Each Plaintiff Was a Victim of Trafficking by the Venture.**

147.     Each Plaintiff was a victim of trafficking by the Venture.  Below, Plaintiffs set forth each Plaintiff's allegations as to both that individual Plaintiff's injuries, as well as the pattern and practice demonstrated by all the Plaintiffs—and the allegations of all the Plaintiffs further corroborate the allegations of each individual Plaintiff.  Accordingly, all Plaintiffs' allegations below are relevant to each Plaintiff's individual allegations.

148.     Plaintiff Al.C. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2015-2017, and specifically on the construction of the Al Thumama Stadium, in which Defendants participated and from which they knowingly benefitted. His direct employer was Al Jaber Engineering. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar, precluding him from leaving the country or his job until the end of his contract. He was forced to work in extreme heat through exhaustion, with workdays beginning at 4:00 AM to travel to the construction site. He was not paid what he was promised, and he was forced to work overtime but was not compensated for all overtime hours worked. He was forced to live in crowded and inhumane living conditions, packed into a room with seven other workers. The food provided in the mess hall was inadequate and unsanitary, including chicken that was not properly cleaned or cooked. He was denied sick leave and automatically marked absent if he could not work. After two years, he was not allowed to leave and was threatened that the company would not pay for his airfare home unless he kept working.  He decided to leave anyway, but the company kept his

passport and he had to remain in Qatar for over two months without pay and without a food allowance.  Finally, his family sent him funds to pay for his air farehome and the company finally gave his passport back to him so he could leave.

149.     Plaintiff A.P. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2016-2019, and specifically on the construction of the Lusail Stadium, in which Defendants participated and from which they knowingly benefitted. His direct employer was Al Jaber Engineering. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. When his passport was taken, he felt fear and was too scared to leave the compound where he stayed. But he felt he had no choice but to comply. He was lied to about his pay and was paid less than promised. He was forced to work through exhaustion, with workdays beginning at 4am due to travel time to the construction site. He was routinely forced to provide overtime work but was not fully compensated for it. He was forced to live in crowded and inhumane living conditions, in dirty rooms infested with bedbugs that housed twice as many as they were designed to. The food provided in the mess hall was unsanitary, poorly cooked, unappetizing, and monotonous.

150.     Plaintiff An.A. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2015-2017, and specifically on the construction of the road infrastructure leading to the Al Wakrah Stadium, in which Defendants participated and from which they knowingly benefitted. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from

73

leaving the country or his job until the end of his contract.  This caused him to be afraid. He was forced to work through exhaustion, sometimes for as many as 24 hours straight when there were deadlines to meet, and he was not compensated for all overtime work. His salary was routinely delayed by more than a month. He was forced to live in crowded conditions, with four workers to a room, with beds infested with bedbugs. The food provided was unsanitary, undercooked, and sometimes did not reach the work site due to distance.  He suffered a workplace injury from lifting heavy piles that caused severe back pain and nerve damage, and he was given only pain medication and no other treatment despite the injury being so severe that it caused him to use a cane.  After his two-year contract ended, he was not allowed to leave immediately but was forced to wait over a month before being permitted to return home.

151.    Plaintiff An.D. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2014-2016, and specifically on the construction of the Lusail Stadium, in which Defendants participated and from which they knowingly benefitted. His direct employer was Midmac Contracting Co. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. He was deceived about both the work he would do and the amount he would be paid. He was forced to work through exhaustion, with workdays beginning at 3am to prepare for a 4am departure to reach the worksite by 6am. He was routinely forced to work overtime but was not fully compensated for it. He was forced to live in crowded and inhumane living conditions, with 8-10 workers packed into rooms with frequently-broken air conditioning and beds infested with bedbugs. The food provided in the mess hall was unsanitary and inadequate, with raw meat and

74

repetitive, unpalatable meals that caused him to become physically weak and lose substantial weight. He suffered a serious workplace injury when his finger was nearly severed, but the company refused to cover his medical costs or honor his insurance claim despite hospital and police documentation.

152.    Plaintiff Ari.R. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2014-2016, and specifically on the construction of the Al Wakrah Stadium, in which Defendants participated and from which they knowingly benefitted. His direct employer was Al Jaber Engineering. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This left him and his family scared and concerned.  He was lied to about his compensation, and was paid much less than was promised.  He was forced to work through exhaustion and extreme heat, with workdays beginning at 3am to prepare for a 5am departure to reach the worksite by 6am.  He was routinely forced to provide overtime work, including on rest days and holidays, sometimes until midnight, but was not fully compensated for that work. He was forced to live in crowded and inhumane living conditions, with seven workers packed into small rooms infested with bedbugs. He was subjected to sudden transfers between accommodations with only an hour's notice to pack his belongings. The food provided in the mess hall was unsanitary and inedible, with raw and foul-smelling meat. He had a heat stroke due to the inhumane working conditions and long workloads but was required to pay for his own medical treatment.

153.    Plaintiff Arn.R. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2015-2017, and specifically on the construction of the Al

75

Wakrah Stadium, in which Defendants participated and from which they knowingly benefitted. His direct employer was Al Jaber Engineering. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. As this was his first trip abroad, the seizure of his passport caused him to feel fear and anxiety, especially since he had no money to pay for his return flight if he refused to comply. He was forced to work through exhaustion and sleep deprivation, routinely working overtime hours. He was typically required to work overtime but was frequently not compensated for all overtime hours worked. He was lied to about his pay. He was forced to live in crowded and inhumane living conditions, packed into a small room infested with bedbugs, and living with seven other workers. The food provided was unsanitary, bland, not nutritious, and at times inedible. Though his contract promised transportation to and from the work site, he was often forced to walk for hours back to his accommodation after long days of work, particularly after overtime shifts.

154. Plaintiff A.V. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2015-2017, and specifically on the construction of the Al Wakrah Stadium, in which Defendants participated and from which they knowingly benefitted. His direct employer was Al Jaber Engineering. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel confused and scared. He was lied to about his pay and he was not paid for all his overtime work. He routinely worked long hours, with days starting at 4:00 AM to catch a 5:00 AM shuttle to begin work at 7:00 AM. He was forced to work through exhaustion,

76

often working until 9:00 PM. When required to work late, he had no transportation back to his accommodation and was forced to either walk for hours or hitchhike. He lived in crowded and inhumane conditions, with eight to ten workers crammed into tiny rooms designed for only 4-6 people. He was frequently forced to move accommodations with no notice, sometimes being woken in the middle of the night to relocate. The food provided in the mess hall was unsanitary, poorly prepared, lacking in nutrition, and often had a bad smell.

155.    Plaintiff C.V. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2013-2015, and specifically on the construction of the Lusail Stadium, in which Defendants participated and from which they knowingly benefitted. His direct employer was Midmac Contracting Co. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work and was told they would keep it until the end of his contract. He was not paid what he was promised, and was undercompensated for his overtime pay. He was forced to work through exhaustion, routinely providing four hours of overtime per day and sometimes working 24-hour shifts. He was forced to live in cramped and inhumane living conditions, packed into a small room with 5-6 other workers, with beddings infested with bedbugs that made sleeping difficult or impossible. The food provided in the mess hall was inadequate, unappetizing, undercooked, not properly cleaned, and repetitive.

156.    Plaintiff E.M. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2015-2018, and specifically on the construction of the Al Wakrah Stadium, in which Defendants participated and from which they knowingly benefitted. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited

to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel scared as he believed it was unsafe to be in a foreign country without identification. He was deceived about his contract, and after signing a two-year contract in the Philippines he was forced to sign a five-year contract upon arrival in Qatar. His pay was frequently delayed and he was denied full overtime compensation despite sometimes being forced to work up to 24-hour shifts to meet deadlines. He was forced to live in crowded and inhumane living conditions, with four workers crammed into small rooms that were uncomfortably tight. The food provided in the mess hall was unsanitary, poorly prepared, lacking in nutrition, and monotonously repetitive. When his employment was terminated by his employer he was forced to spend three months in the barracks with no work, no pay, and no food allowance while waiting to be allowed to return to the Philippines.

157.   Plaintiff Ed.T. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2015-2018, and specifically on the construction of roads for the Al Wakrah Stadium, in which Defendants participated and from which they knowingly benefitted. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel anxiety, particularly when going outside, due to fear of inspections without identification. After signing a two-year contract in the Philippines, he was forced to sign a five-year contract once in Qatar. His salary payments were frequently delayed up to a month, and he was often denied compensation for overtime work, including instances where

78

he was forced to work 24-hour shifts. He was forced to live in crowded and inhumane conditions. The food provided in the mess hall was unsanitary and substandard. Due to the remote location of his worksite, food sometimes did not reach them at all, forcing workers to share meals. When he demanded to leave, he was forced to spend two months in the accommodation without work or pay while the company withheld his final salary, gratuity benefits, and passport, leaving him without means to purchase a plane ticket home.

158.     Plaintiff E.D.L. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2015-2018, and specifically on the construction of the Al Thumama Stadium, in which Defendants participated and from which they knowingly benefitted. His direct employer was Al Jaber Company. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel fear. He was not paid what he was promised, he routinely experienced delayed salary payments and was regularly denied compensation for overtime work. He was forced to live in crowded and inhumane living conditions, packed into a room with eight other people, with infestations of bedbugs. The food provided through mess halls was poor quality and repetitive.

159.     Plaintiff E.L. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2015-2017, and specifically on the construction of roads leading to the Al Wakrah Stadium, in which Defendants participated and from which they knowingly benefitted. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his

79

passport when he first arrived in Qatar and began work, stating it was "their policy," which caused him to feel scared and powerless. He was forced to work through exhaustion and sleep deprivation, with shifts lasting up to 24 hours. He was lied to about his compensation, was forced to sign a new contract when arriving in Qatar and was consistently denied full compensation for his overtime work. He was forced to live in crowded and inhumane living conditions, packed into a small room with three other people, with beds infested with bedbugs, which caused him many sleepless nights. The food provided in the mess hall was often raw, unsanitary, and improperly prepared, with chicken still having feathers and meat visibly bloody. At the end of his contract, he was detained for more than a month without work or pay before finally being allowed to leave Qatar.

160. Plaintiff Er.T. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2015-2017, and specifically on the construction of the Al Wakrah Stadium, in which Defendants participated and from which they knowingly benefitted. His direct employer was Al Jaber Engineering. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel fear, as it was his first time working abroad, but he felt he had no choice but to comply. He was not paid what he was promised. He routinely experienced salary delays lasting weeks or months, forcing him to borrow money from coworkers to buy food. He was forced to work through exhaustion, working twelve hour shifts, as well as four hours of overtime each day for which he was not compensated. He was forced to live in crowded and inhumane living conditions, with six to eight people packed into rooms designed for three to four people, with infestations of bedbugs that caused sleepless nights. The food provided in the mess

80

hall was terrible, lacked nutrition, repetitive, and often spoiled, though he had to eat it due to extreme hunger.

161.    Plaintiff F.S. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2015-2017, and specifically on the road infrastructure for the Al Wakrah Stadium, in which Defendants participated and from which they knowingly benefitted. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel scared, as he felt he had no choice. He experienced a significant reduction in his promised compensation, and salary delays lasting weeks or months. He was forced to work through exhaustion, sometimes working 24 hours straight, and was not permitted to refuse overtime when demanded. He was not compensated for all overtime hours worked. He was forced to work in dangerous conditions, being required to continue working even during "red flag" warnings indicating work should stop due to extreme heat. The food provided in the mess hall was poorly prepared and at times inedible.

162.    Plaintiff F.T. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2015-2017, and specifically on the construction of the Al Wakrah Stadium, in which Defendants participated and from which they knowingly benefitted. His direct employer was Al Jaber Engineering. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel scared for his safety and life, as he knew nothing about Qatar's

81

laws and felt he could not return home. He was deceived about his compensation and was forced to routinely do overtime work for which he was not fully compensated. He was forced to live in crowded and inhumane living conditions, with 8-10 people packed into rooms designed for only 4 people, and with beds infested with bedbugs. He was repeatedly forced to move between different accommodations without notice. The food provided in the mess hall was terrible. He was forced to work in extreme heat and humidity and he often was required to walk for several hours back to his accommodation after long work shifts.

163.     Plaintiff F.B. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2014-2016, and specifically on the construction of the Al Rayyan and Al Khalifa Stadiums, in which Defendants participated and from which they knowingly benefitted. His direct employer was Midmac Contracting Co. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel shocked, terrified, and afraid of being unable to return home even in an emergency. He was deceived about his compensation and was not compensated for all his overtime.  He was forced to live in crowded and inhumane living conditions, with 6-8 people packed into rooms designed for only 3-4 people. The rooms were dirty and filthy with broken bathroom facilities that had sewage problems.  The food provided was almost inedible.

164.     Plaintiff G.D.L. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2015-2018, and specifically on the construction of the Al Thumama Stadium, in which Defendants participated and from which they knowingly benefitted.

82

His direct employer was Al Jaber Engineering. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel fear, as he knew he could not return home even if something happened to him or his family in the Philippines. He was lied to about his compensation. He was not paid for all his overtime work. He was forced to work through exhaustion, with workdays beginning at 5:00 AM for travel to the worksite, and routinely forced to work multiple hours of overtime per day. He was forced to live in crowded and inhumane living conditions, packed into a small room with seven other workers, and with beds infested with bed bugs which caused even more fatigue. The food provided was poor quality and monotonous.

165.    Plaintiff G.O. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2015-2019, and specifically on the construction of the Al Wakrah Stadium, in which Defendants participated and from which they knowingly benefitted. His direct employer was Al Jaber Engineering. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. He was lied to about his pay and was not compensated for his overtime work. He was forced to work through exhaustion, with workdays lasting at least 12 hours, and for which he would have to wake at 4:00 AM to travel to the worksite. When return transportation was not provided, he was forced to either hitchhike or walk several hours back to his accommodations. He suffered a workplace injury when he fell from scaffolding and dislocated his rib, but was forced to go to the hospital alone, pay all medical expenses himself, and return to work the next day. He was

forced to work through episodes of high blood pressure caused by intense heat, being denied rest even when he reported feeling unwell. He was forced to live in crowded and inhumane living conditions, packed into rooms designed for four people with 6-8 workers, and with beds infested with bed bugs that made sleep difficult. The food provided in the mess hall was of poor quality, often spoiled or improperly prepared.  He was forced to stay longer than his initial two-year contract because his employer threatened not to pay his severance benefits and for his return flight to the Philippines if he did not stay longer.

166.    Plaintiff H.V. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2014-2016, and specifically on the construction of the Al Wakrah Stadium, in which Defendants participated and from which they knowingly benefitted. His direct employer was Al Jaber Engineering. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. He was lied to about his compensation and was denied overtime compensation.  His food allowance was not provided consistently, forcing him to subsist at times on only eggs. He was forced to work through exhaustion, with workdays requiring him to wake at 3:00 AM to get on a a crowded bus, and his day would not end typically at 7:00 PM.  He was forced to work overtime, sometimes until midnight.  He suffered a heat stroke from being forced to work in extreme heat conditions. He was forced to live in crowded and inhumane living conditions, with eight workers packed into a small room that felt "like living as squatters," and he was six times moved between accommodations without notice.

167.    Plaintiff J.N.B. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2015-2017, and specifically on the construction of the Al Wakrah Stadium and associated infrastructure, in which Defendants participated and from which they knowingly benefitted. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel anxiety, and he was afraid to leave his accommodations and concerned the company could do whatever they wanted to him.  He was forced to work through exhaustion, routinely working overtime, and at times was required to work 24 hours straight. He was not paid what he was promised and he was not compensated for all overtime work he provided.  He was forced to live in crowded and inhumane living conditions, packed into a small room with three other people. The drinking water provided was not potable, forcing him to purchase his own bottled water. He was forced to continue working in extreme heat even when Qatar's "red flag" rule mandating work stoppage during high temperatures was in effect.

168.    Plaintiff J.F. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2016-2018, and specifically on infrastructure for the Al Rayyan, Al Thumama, Lusail, and Al Janoub Stadiums, in which Defendants participated and from which they knowingly benefitted. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract.  Though he had signed a two-year

contract in the Philippines, upon arrival he was coerced into signing a five-year contract. He was not paid what he was promised, and was not paid for all his. He was forced to work through exhaustion, routinely working 5 hours of overtime daily, until 11:00 PM, and sometimes he was forced to work 24-hour shifts and sleep at the worksite. He was forced to live in crowded and inhumane living conditions, with four workers packed into a small room with beds infested with bedbugs. The food provided in the mess hall was dirty, smelly, and undercooked, with chicken sometimes served still bloody. He was suddenly terminated after two years but he was forced to wait two months in the barracks without pay before being allowed to return home.

169. Plaintiff J.A. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2015-2018, and specifically on the construction of the Al Wakrah Stadium, in which Defendants participated and from which they knowingly benefitted. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. He felt he had no choice but to surrender his passport. The contract he signed in the Philippines was for two years, but upon arrival he was coerced into signing a five-year contract, feeling he had no choice, once again, as he was already in Qatar. He was forced to work through exhaustion, routinely working 18-hour days until midnight or 1:00 AM. He was not compensated for all overtime hours worked. He was forced to live in crowded and inhumane living conditions, with four workers packed into a small, uncomfortable room. The food provided in the mess hall was dirty, smelly, and disgustingly undercooked. The company withheld his gratuity pay to ensure his return to Qatar, but then he was terminated without cause, but then forced to remain in Qatar

86

for over three months without pay before being allowed to return home. Though permitted to stay in the barracks during this period, he had to pay for his own food and eventually paid for his own airfare to return to the Philippines.

170.    Plaintiff J.C. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2015-2017, and specifically on the construction of the Lusail Stadium, in which Defendants participated and from which they knowingly benefitted. His direct employer was Midmac Contracting Co. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel anxious and nervous, as he realized he would be unable to return home even if he was treated badly. He was forced to work through exhaustion, beginning his days at 3:00 AM to catch a 4:00 AM bus to the worksite. When his initial two-year contract was complete, he was told he could not leave and was forced to extend his stay for another year via the threat that if he left he would forfeit his benefits and back pay. Having no money to pay for his own return travel, he felt trapped and was forced to continue working. He was deceived about his pay, and he was denied much of his overtime pay.  He was forced to live in crowded and inhumane living conditions, packed into a room designed for six people with nine other workers. The food provided was unsanitary and sometimes raw, with the cooking areas poorly maintained, forcing him at times to spend his limited salary on outside food.

171.    Plaintiff J.P. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2015-2019, and specifically on the construction of the Al Wakrah Stadium and related infrastructure, in which Defendants participated and from which they

87

knowingly benefitted. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. The seizure of his passport was a "traumatizing experience" that caused him to feel both fear and anxiety, because although he resisted giving it up, he was forced to. Upon arrival in Qatar he was also forced to sign a new five-year contract despite having signed only a two-year contract in the Philippines, and he was told if he did not sign he would have to pay his own way back to the Philippines. He was forced to work through exhaustion, at times being required to work 48 hours straight to meet deadlines. He was not paid for all his overtime work. He was forced to live in crowded and inhumane living conditions, packed into a room with seven other workers. He was forced at times to walk long distances to the worksite when no transport was provided. When he attempted to resign, the company forced him to remain in the accommodation without pay for more than two months before allowing him to leave.

172.    Plaintiff L.G. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2013-2015, and specifically on the construction of the Lusail Stadium, in which Defendants participated and from which they knowingly benefitted. His direct employer was Midmac Contracting Co. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. He was forced to work through exhaustion, beginning his days at 4:00 AM to transport other workers and sometimes being forced to work 24 hours straight to meet deadlines. He was not compensated for his overtime work. He was forced to drive buses with broken air conditioning in

88

unbearable heat. He was forced to live in crowded and inhumane living conditions, packed into a cramped room with seven other workers, which was infested with bedbugs and sometimes with broken air conditioning, so that he was unable to sleep. The food provided was poor quality, repetitive, and improperly prepared, with meat sometimes still containing blood.

173.    Plaintiff P.C. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2014-2016, and specifically on the construction of the Khalifa Stadium, in which Defendants participated and from which they knowingly benefitted. His direct employer was Midmac Contracting Co. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport without explanation when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel fear and anxiety. He was forced to work through exhaustion, having to wake up at 3:00 AM to leave the accommodation by 4:00 AM to go to the worksite. Though required to work overtime, he was not fully compensated for his overtime work. He was forced to live in crowded and inhumane living conditions, packed into a room with nine other workers, often with broken air conditioning making the room extremely hot. The food provided in the mess hall was unsanitary and sometimes raw, forcing him to eat poorly prepared food just to have enough energy for work.

174.    Plaintiff Ra.L. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2017-2019, and specifically on the construction of the road infrastructure for the Al Wakrah Stadium, in which Defendants participated and from which they knowingly benefitted. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his

passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. He was paid less than he was promised and was not fully compensated for his overtime work. He was forced to live in cramped and inhumane living conditions, packed into a small room with three other workers, with beds infested with bedbugs that led to sleepless nights. The food provided was inadequate and monotonous. The tap water provided was undrinkable and when he tried to drink it due to the intense heat, it made him sick. After two years he had to remain in Qatar for five months with no pay while waiting for his final pay and return travel.

175.    Plaintiff Ra.V. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2015-2018, and specifically on the construction of the Al Wakrah Road project, in which Defendants participated and from which they knowingly benefitted. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport immediately upon his arrival in Qatar. He was forced to sign a new contract that reduced his base salary from what was promised and extended his term of service beyond the original two-year agreement, with no opportunity to review or understand the terms before being pressured to sign. He was forced to work through exhaustion with daily overtime but was consistently denied full compensation for his overtime hours. He was forced to live in crowded and inhumane living conditions, first packed into a small room with five other workers and later with three others, with persistent bedbug infestations in both accommodations. The food provided in the mess hall was often inedible, undercooked, and unhygienic. Food deliveries to the worksite were often late and spoiled, forcing him to survive on bread and coffee. When he attempted to resign he was initially refused, but then

was told to stop reporting to work and was detained in the accommodation for more than a month without work or pay before being allowed to leave Qatar, and he had to pay for his own airfare home.

176.    Plaintiff R.B. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2015-2018, and specifically on the construction of the road leading to the Al Wakrah Stadium, in which Defendants participated and from which they knowingly benefitted. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. He felt confused and anxious but had no choice but to comply since he was in a foreign country. He was deceived about the terms of his employment, and after signing a 2-year contract in the Philippines, he was forced upon arrival to sign a new 5-year contract and was told to "forget about" his original contract. He was not fully compensated for all overtime worked.  He was forced to work through exhaustion, at times working 24-hour shifts. He was forced to live in crowded and inhumane conditions, with four to five workers packed into a single room infested with bedbugs and cockroaches, and was moved between accommodations multiple times. The food provided in the mess hall was inadequate and unsafe. When he was terminated he was forced to remain in the barracks for more than three months without work or pay before being allowed to leave.

177.    Plaintiff R.B.E. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2015-2017, and specifically on the construction of the Al Wakrah Stadium and related infrastructure, in which Defendants participated and from which they

91

knowingly benefitted. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport immediately upon his arrival in Qatar, precluding him from leaving the country or his job until the end of his contract. This caused him to feel very anxious because it was his first time abroad. He was lied to about his compensation and was not paid for all his overtime work. He was forced to sign a five-year contract, different than what he had agreed to before leaving the Philippines. He was forced to work through exhaustion, having to leave at 5:00 AM to begin work at 6:00 AM, and was frequently required to work overtime. When he tried to resign he initially was not allowed to, and the company stopped allowing him to work while forcing him to remain in the accommodation without pay or salary for over a month.

178.    Plaintiff Re.C. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2015-2018, and specifically on the construction of road infrastructure for the World Cup stadiums, in which Defendants participated and from which they knowingly benefitted. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him confusion and distress. He was deceived about his contract terms, having signed a two-year contract in the Philippines but being forced to sign a five-year contract upon arrival in Qatar, but he felt he had no choice. He was forced to work through exhaustion, with workdays regularly stretching from 6:00 AM to 10:00 PM. He was forced to live in crowded and inhumane living conditions, packed into a small room with two other people, with beds infested with bedbugs which made sleep difficult. He injured his foot on the job and the

foot became infected, requiring surgery, but because of the company's "no work, no pay" policy, he was not paid for the days he spent recovering from the procedure. When he attempted to resign, his employer refused to release his benefits or allow him to leave Qatar, and he was forced to stay for two months without work or money until he was finally allowed to return home.

179.    Plaintiff Ri.C. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2013-2015, and specifically on the construction of the Lusail Stadium, in which Defendants participated and from which they knowingly benefitted. His direct employer was Midmac Contracting Co. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport immediately upon his arrival, precluding him from leaving the country or his job until the end of his contract. This caused him to feel shocked and fearful about staying in Qatar without documentation. He routinely was forced to work overtime, with standard shifts of 8 hours being extended by an additional 4 to 6 hours nearly every day. He was sometimes forced to work 24-hour shifts. He was not paid what he was promised, and his overtime was not fully compensated. He was forced to live in crowded and inhumane living conditions, packed into a very small room with three other workers, with old bedding infested with bed bugs that made it difficult to sleep. The food provided in the mess hall was unsanitary and poorly prepared, with chicken sometimes served raw with traces of blood. The food often had an unpleasant odor and was not properly cleaned.

180.    Plaintiff R.F. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2015-2018, and specifically on the construction of road infrastructure for the World Cup stadiums, in which Defendants participated and from which they knowingly benefitted. His direct employer was Habtoor Leighton Group. Venture participants,

93

including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel scared and extremely nervous, as he knew he could not return to the Philippines without his passport. He was deceived about his compensation and was forced to sign a new contract upon arrival in Qatar, different from the two-year agreement he had signed before departure. He was forced to work through exhaustion, routinely being made to work overtime, and was sometimes forced to work for 24 hours straight, but was not compensated for all overtime work.  He was forced to live in crowded and inhumane living conditions, packed into a room with three other workers. The food provided in the mess hall was unsanitary, dirty, undercooked, and at times disgusting to eat. When he was terminated by his employer, he was forced to wait in Qatar for three months without pay or means to support his family while trying to secure assistance to get home.

181.    Plaintiff Rog.B. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2015-2016, and specifically on the construction of the Al Wakrah Stadium, in which Defendants participated and from which they knowingly benefitted. His direct employer was Al Jaber Engineering. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel anxious and "like a prisoner" since he could not leave even in case of emergency. He was regularly forced to work overtime without compensation.  He experienced unexplained deductions to his pay.  He was forced to live in crowded and inhumane living conditions, packed into a cramped space with 8-10 other people, with beds infested with

94

insects and bedbugs, and with only a few toilets shared by more than a hundred workers. The food provided was disgusting.  When he attempted to resign, he was denied his right to leave, told he must complete his contract, and was denied his backpay and benefits. After that, he was forced to remain in Qatar for two additional months without work or pay, having to pay for his own food and expenses while waiting to be allowed to return home.

182.    Plaintiff Rom.B. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2015-2017, and specifically on the construction of the Al Wakrah Stadium, in which Defendants participated and from which they knowingly benefitted. His direct employer was Al Jaber Engineering. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him to feel scared and powerless as it was his first time working abroad. He asked for his passport back but was denied.  He was lied to about his compensation, and he was not compensated for his overtime work.  He was forced to work through exhaustion, working 12-hour shifts.  He was forced to continue working even in extreme heat conditions when other companies' workers were allowed to stop. He was forced to live in crowded and inhumane living conditions, packed into a small space with 6-8 other people, with beds infested with insects and bedbugs, and was subjected to sudden transfers without notice, sometimes in the middle of the night. The food provided was inadequate, dirty and unhealthy.  When he attempted to resign, he was initially told he could not leave before his two-year contract ended and that he must go back to work.  Days later he was told to stop work but was forced to remain in Qatar for two additional

95

months without work or pay, having to pay for his own food and expenses while waiting to be allowed to return home, and then he was denied backpay and other benefits when he left.

183.    Plaintiff R.E. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2015-2016, and specifically on the construction of the Lusail Stadium, in which Defendants participated and from which they knowingly benefitted. His direct employer was Al Jaber Engineering. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. He was forced to work through exhaustion, with required 12-hour workdays, and even in extreme heat conditions when other companies had stopped work. He was lied to about his compensation and was not paid for his overtime work.  He was forced to live in crowded and inhumane living conditions, packed into a small room with six to seven other people in a space designed for only four. He was forced to walk for hours between the worksite and accommodation due to lack of transportation. The food provided was inadequate and often unsafe, including undercooked chicken with visible blood. When he attempted to resign, he was initially refused and told to go back to work.  Then, he was told to stop working but he was forced to wait almost two months, during which he received no pay or food allowance, before being allowed to depart Qatar, and he was denied his backpay and other benefits when he left.

184.    Plaintiff R.N. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2015-2018, and specifically on the construction of the road leading to the Al Wakrah Stadium, in which Defendants participated and from which they knowingly benefitted. His direct employer was Habtoor Leighton Group. Venture participants,

96

including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. He felt he had no choice but to give up his passport. He was lied to about his compensation, and was denied overtime pay. He was forced to sign a new 5-year contract upon arrival in Qatar, different from the 2-year contract he had signed. He had to work through exhaustion, waking up at 3:00 AM to travel to the worksite, with work until at least 5:00 PM before traveling back to the accommodations. He had to endure work in extreme heat. He was not provided clean drinking water, so he had to purchase water. The food provided was inadequate and unsanitary, with chicken sometimes served still having feathers. When he attempted to resign, he was initially refused permission to leave. After being told he would be sent home, he was forced to remain in the accommodation for two months without work or salary before being allowed to leave.

185.     Plaintiff R.T. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2015-2018, and specifically on the construction of the road leading to the Al Wakrah Stadium, in which Defendants participated and from which they knowingly benefitted. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. After signing a 2-year contract in the Philippines, he was forced upon arrival to sign a new 5-year contract and did so because he felt he had no choice. He was not fully compensated for overtime work despite being forced to work 24-hour shifts. He was forced to live in crowded and inhumane conditions, with accommodation repeatedly moved to

97

locations so distant from work sites that food deliveries often could not reach the workers, leaving them hungry. The food provided in the mess hall was inadequate and unsafe.  At the end of his work, the company claimed it was terminating him but he was forced to remain in his accommodation without work or pay for over two months before being allowed to depart Qatar.

186.    Plaintiff T.L. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2017-2019, and specifically on the construction of the road infrastructure for the Al Wakrah Stadium, in which Defendants participated and from which they knowingly benefitted. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. This caused him distress when he realized he would not be able to return home even in emergencies. Upon arrival he was forced to sign a new contract for less money than the contract he signed in the Philippines, and for a longer period.  He was forced to work overtime that was not fully compensated. He was forced to live in crowded and inhumane living conditions, packed into rooms with three other workers, with infestations of bedbugs, and at times without functioning air conditioning during extreme heat. He was frequently forced to move between different accommodations with little notice. The food provided was inadequate, and monotonous. He was forced to purchase his own drinking water as the provided tap water made workers sick. After his second year, when he tried to leave, the company delayed his departure for a month and forced him to pay for his own plane ticket back to the Philippines.

187.    Plaintiff V.M. worked as a construction worker on the World Cup Construction Venture during his time in Qatar in 2015-2018, and specifically on the road infrastructure for the

World Cup stadiums, in which Defendants participated and from which they knowingly benefitted. His direct employer was Habtoor Leighton Group. Venture participants, including but not limited to, on information and belief, his direct employer, confiscated his passport when he first arrived in Qatar and began work, precluding him from leaving the country or his job until the end of his contract. When he arrived, he was forced to sign a new 5-year contract despite having originally agreed to a 2-year term in his home country. This caused him distress, but he felt he had no choice but to sign. He was forced to work through exhaustion, with workdays sometimes as long as 18 hours. He was not paid what he was promised, and his salary was frequently delayed by a month or more and his overtime work was often not fully compensated. He was forced to live in crowded and inhumane living conditions, packed into a small room with three other workers, with beds infested with bed bugs that caused him sleepless nights. The food provided in the mess hall was unsanitary, smelly, and sometimes inedible due to being undercooked. When he was terminated he was forced to remain in Qatar for four additional months without work or salary while waiting to be allowed to leave. He was forced to pay for his own ticket back to the Philippines.

188.    To the extent any of Plaintiffs' claims would otherwise be untimely, the wrongful conduct of Defendants and other Venture participants prevented Plaintiffs from asserting those claims in a timely manner. While they were in Qatar, the removal of their passports, as well as the Qatar regime's support for the trafficking and labor abuses suffered by migrant workers, made it impossible for Plaintiffs to vindicate their legal rights. After they returned to the Philippines, Plaintiffs could not reasonably have identified that Defendants were liable for their injuries, including because Defendants concealed their knowledge of, and profit from, the human trafficking that formed the backbone of the World Cup Construction Venture.

99

**COUNT 1**
**TRAFFICKED AND FORCED LABOR**
**TVPRA, 18 U.S.C. §§ 1589, 1590, and 1595**

189.    Plaintiffs incorporate by reference all foregoing paragraphs of this Complaint as if fully set forth herein.

190.    The World Cup Construction Venture engaged in trafficked and forced labor.

191.    Defendants' construction ventures obtained Plaintiffs' and others' labor by means of abuse and/or threatened abuse of law or legal process by misrepresenting the terms and conditions of their employment in Qatar, confiscating Plaintiffs' passports, telling Plaintiffs they could not leave and must endure the conditions imposed upon them, imposing debt bondage by requiring Plaintiffs to pay for their own "recruitment fee" or telling Plaintiffs they would be responsible for the cost of returning to the Philippines, denying Plaintiffs permission to return home unless they paid sums they could not afford, and/or threatening legal prosecutions.

192.    Defendants' construction ventures obtained the labor of Plaintiffs and others by means of a scheme, plan, or pattern of acts intended to cause Plaintiffs to believe that if they did not work they would be subjected to serious harm, including but not limited to, by confiscating Plaintiffs' passports, imposing debt bondage by requiring Plaintiffs to pay for their own "recruitment fee" or telling Plaintiffs they would be responsible for the cost of returning to the Philippines, denying Plaintiffs permission to return home unless they paid sums they could not afford, and/or threatening legal prosecutions.

193.    Plaintiffs were forced, by Plaintiffs' direct employers who were venture partners with Defendants, to work in extreme and dangerous conditions, many hours more than they would have otherwise, and for lengths of time they otherwise would not have, and to live in inhumane,

unsafe, and unhealthy conditions, due to the fact that they were not in possession of their passports and were made to believe they had no other choice.

194. Defendants' venture partners, including but not limited to Plaintiffs' direct employers, lied to Plaintiffs about the conditions Plaintiffs would live in and the terms of Plaintiffs' working conditions and compensation, and this fraud caused Plaintiffs to agree to go to Qatar and be lured into conditions of forced labor for the benefit of the World Cup Construction Venture.

195. Each Plaintiff worked for the World Cup Construction Venture by providing construction labor for one or more of the projects included therein, such as one or more of Al Thumama Stadium, Al Wakrah Stadium, Khalifa Stadium, Al Rayyan Stadium, and/or Lusail Stadium, and related infrastructure.

196. Each Plaintiff was subjected to abusive practices by his employer(s) (who each were participants with Defendants in the World Cup Construction Venture), including by having his passport confiscated, not being able to leave Qatar and/or change employers in Qatar, being forced to work inhumane hours, being forced to live and work in unsafe and unsanitary conditions, and/or being underpaid or denied or delayed payments.

197. Plaintiffs were therefore victims of trafficked and forced labor under 18 U.S.C. § 1589 and 18 U.S.C. § 1590, triggering Defendants' liability under 18 U.S.C. § 1595.

198. Defendants participated in the World Cup Construction Venture. Indeed, Defendants signed a contract to oversee and manage construction of all the facilities and infrastructure for the World Cup, including but not limited to Al Thumama Stadium, Al Wakrah Stadium, Khalifa Stadium, Al Rayyan Stadium, and Lusail Stadium.

101

199.    Defendants knew or should have known, or recklessly disregarded that, the World Cup Construction Venture engaged in trafficked and forced labor in light of the prevalence of Qatar's *kafala* system; the norms of the construction industry in Qatar; public reporting, government reports, and non-profit reports; notices provided directly to Defendants; Defendants' internal processes and procedures; Google and Wikipedia; Defendants' role as overseer and manager (with rights to, and contractual responsibilities for, inspecting, auditing, and overseeing employment practices); Qatar Foundation's role; Defendants' due diligence; Defendants' corporate security and intelligence functions; Defendants' artificial intelligence technology; Defendants' interactions with other Venture participants; and via Defendants' agents and employees in Qatar and in the Philippines.

200.    Defendants knowingly benefitted in the United States from their participation in the World Cup Construction Venture.  They received, at a minimum, $5 million dollars each year they participated in the Venture, and likely much more.  Defendants profited thereby.

201.    Defendants are therefore liable to Plaintiffs for damages and attorneys' fees under 18 U.S.C. § 1595(a).

**COUNT 2**
**RESTITUTION**
**TVPRA, 18 U.S.C. § 1593**

202.    Plaintiffs incorporate by reference all foregoing paragraphs of this Complaint as if fully set forth herein.

203.    Plaintiffs are victims of Defendants' offenses under the TVPRA.

204. Plaintiffs are therefore entitled to the greater of the full amount of the gross income or value to Defendants of Plaintiffs' labor or the value of Plaintiffs' labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act.

## VI. JURY TRIAL

205. Plaintiffs demand trial by jury on all issues so triable.

## VII. PRAYER FOR RELIEF

206. WHEREFORE, Plaintiffs pray this Court will enter an Order:

(a) Entering judgment in favor of Plaintiffs on all counts of the Complaint;

(b) Awarding each of the Plaintiffs monetary damages, subject to proof and in an amount to be determined at trial, including but not limited to restitution, fees and costs paid, debts incurred, and wages promised but not paid;

(c) Awarding each of the Plaintiffs consequential damages;

(d) Awarding each of the Plaintiffs damages for mental anguish and pain and suffering Plaintiffs experienced as a result of being forced to labor against their will, in inhumane conditions, and at risk of injury and death;

(e) Awarding each of the Plaintiffs punitive and exemplary damages for their federal-law claims;

(f) Awarding Plaintiffs any and all other damages allowed by law according to proof to be determined at trial;

(g) Awarding Plaintiffs reasonable attorneys' fees and costs; and

(h) Granting such other relief as the Court deems just and equitable.

Respectfully submitted this 20th day of April, 2026,

/s/ Eli J. Kay-Oliphant
Eli J. Kay-Oliphant
  eli.kay-oliphant@sparacinopllc.com
Ryan R. Sparacino (application forthcoming)
  ryan.sparacino@sparacinopllc.com
Matthew J. Fisher (application forthcoming)
  matt.fisher@sparacinopllc.com
Sparacino PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel:  (202) 629-3530

Sean Grimsley, Atty. Reg. # 36422
  sgrimsley@olsongrimsley.com
Jason Murray, Atty. Reg. # 43652
  jmurray@olsongrimsley.com
Eric Olson, Atty Reg. #36414
  eolson@olsongrimsley.com
Abigail Hinchcliff, Atty Reg. #47942
  ahinchcliff@olsongrimsley.com
Olson Grimsley Kawanabe Hinchcliff & Murray LLC
700 17th Street, Suite 1600
Denver, CO 80202
Tel: 303-535-9151

*Counsel for Plaintiffs*